**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **BASIC CAPITAL MANAGEMENT, INC.,** **AMERICAN REALTY TRUST, INC.,** **TRANSCONTINENTAL REALTY** **INVESTORS, INC., and DYNEX** **COMMERCIAL, INC.,** **Plaintiffs,** **v.** **DYNEX CAPITAL, INC, DYNEX** **COMMERCIAL, INC a/k/a DCI** **COMMERCIAL, INC, STEPHEN** **BENEDETTI, ICD HOLDING, INC., and** **DYNEX HOLDING, INC.,** **Defendants.** | **Civil Action No. 3:17-CV-1147-D** |

**PLAINTIFFS' FIRST AMENDED COMPLAINT**

**TO THE HONORABLE JUDGE OF SAID COURT:**

**COME NOW** Plaintiffs, Basic Capital Management, Inc. ("BCM"), Transcontinental Realty Investors, Inc. ("TCI"), Michael J. Quilling, as the duly appointed and qualified Receiver of the hereinafter described Judgment entered for American Realty Trust, Inc. ("Receiver" or "ART"), and Michael J. Quilling, as the duly appointed and qualified Receiver of Dynex Commercial, Inc. ("Dynex Commercial") (collectively "Plaintiffs") ,and file this their Plaintiffs' First Amended Complaint against Defendants Dynex Capital ("Dynex Capital"), Dynex Commercial, Inc. a/k/a DCI Commercial, Inc. ("Dynex Commercial"), Stephen Benedetti ("Benedetti"), ICD Holding, Inc. ("ICD"), and Dynex Holding, Inc. ("Dynex Holding") and, for cause, would respectfully show unto the Court, as follows:

## I. PARTIES

1.      Plaintiff BCM is a Nevada corporation with its principal place of business in Dallas, Dallas County, Texas.  BCM is authorized to do business in the State of Texas.

2.      Plaintiff ART is a Georgia corporation with its principal place of business in Dallas, Dallas County, Texas.  ART is authorized to do business in the State of Texas.

3.      Plaintiff TCI is a Nevada corporation with its principal place of business in Dallas, Dallas County, Texas.  TCI is also the successor of a merger with Continental Mortgage & Equity Trust ("CMET").  TCI is authorized to do business in the State of Texas.

4.      Defendant Dynex Capital is a Virginia corporation with its principal place of business in Glen Allen, Virginia.  Dynex Capital is the indirect parent corporation of Dynex Commercial.  Dynex Capital and has appeared in this action although it has not as yet answered.

5.      Defendant Dynex Commercial a/k/a DCI Commercial, Inc. is a Virginia corporation with its principal place of business in Glen Allen, Virginia and has made an appearance in this action although it has not as yet answered.

6.      Defendant Stephen Benedetti is an individual residing in Glen Allen, Virginia, and may be served at 4991 Lake Brook Drive, Suite #100, Glen Allen, Virginia, 23060.

7.      Defendant ICD Holding, Inc. is a corporation with its principal place of business in Glen Allen, Virginia.  ICD may be served through its registered agent, Stephen J. Benedetti, at 4991 Lake Brook Drive, Suite #100, Glen Allen, Virginia 23060, or wherever else he may be found.

8.      Defendant Dynex Holding, Inc. is a corporation with its principal place of business in Glen Allen, Virginia.  Dynex Holding may be served through its registered agent, Stephen J.

---

Benedetti, at 4991 Lake Brook Drive, Suite #100, Glen Allen, Virginia 23060, or wherever else he may be found.

## II. JURISDICTION AND VENUE

9.      In denying Plaintiffs' motion to remand this action, his Court determined that it has jurisdiction over this matter pursuant to 28 U.S.C. §1332(a)(3), diversity of citizenship, and because the amount in controversy exceeds $75,000.00.

10.     Likewise, this court has previously determined that venue is proper in the Northern District of Texas, Dallas Division pursuant to 28 U.S.C. §§1441(a), 1446(a) since the matter was removed to this court from the 68th Judicial District Court of Dallas County, Texas.

## III. BACKGROUND FACTS

11.     Defendants Dynex Capital and Dynex Commercial (collectively "Dynex") are affiliated real estate lending companies. Dynex Capital is a publicly traded company on the New York Stock Exchange. After Dynex made a number of multi-million dollar real estate loans to ART and TCI (referred to collectively as "BCM Affiliates"), Dynex and BCM—on behalf of the BCM Affiliates—entered into a transaction that included two loan commitments: one to borrow $33.4 million to acquire and develop three buildings in New Orleans ("the New Orleans Loan Commitment"), and the other to borrow $160 million to finance other commercial and multi-family properties (the "$160 Million Commitment").

12.     The only loan Dynex ever funded under the $160 Million Commitment was made in April 1998 to a bankruptcy remote subsidiary of TCI to finance three apartment projects. Several months later, with sixteen (16) months and $154 Million remaining on the Commitment, BCM attempted to borrow additional funds. Dynex refused to honor the terms of the commitment or to consider any proposals at the agreed rate or to fund tenant improvements under the New

Orleans Loans unless the BCM Affiliates cancelled the remainder of the $160 Million Commitment.

13.     Plaintiffs sued Dynex Commercial[1] for breach of the $160 Million Commitment and for refusing to fund the tenant improvements under the New Orleans loans and Dynex Capital for other related claims.  After a six-week trial, the jury unanimously found a breach of both the $160 Million Commitment and the New Orleans Loan Commitment and awarded substantial damages to Plaintiffs.  The jury rendered a verdict in the total amount of $28,059,187.25, plus $1,950,000.00 in attorney's fees, and an additional $100,000 in attorney's fees for an appeal to the court of appeals and $50,000 for an appeal to the Texas Supreme Court. However, the trial court granted Dynex Commercial's post-verdict motion for judgment notwithstanding the verdict and rendered judgment that Plaintiffs "take nothing."  At the hearing on the post-trial motions before Judge Charles Stokes, then judge of the 68th Judicial District Court, arguments were made by counsel for Plaintiff's that the Court should leave the jury's verdict in place and allow the case go up on appeal so that Dynex Commercial would be forced to post a bond.  Dynex Commercial represented to the Court "on the record" that Dynex Commercial had the financial capability to pay any judgment that may be ultimately rendered against them and that no bond was needed.  The Court accepted Dynex Commercial's representation, and the "take nothing" verdict was entered.

14.     After a series of appeals to the Dallas Court of Appeals and the Texas Supreme Court[2], the case ultimately resulted in a final, non-appealable judgment (the "Final Judgment") in favor of the original Plaintiffs that was entered by the Honorable Judge Martin Hoffman, at the direction of the appeals courts, which awarded $448,899.59 plus post-judgment interest to BCM,

---

[1] The underlying case giving rise to this fraudulent transfer/alter-ego action is cause no. DC-03-00675, *Basic Capital Management, Inc., et. al. v. Dynex Commercial, Inc., et. al.*, in the 68th Judicial District Court of Dallas County, Texas (the "State Action").

[2] *See Basic Capital Mgmt., Inc. v. Dynex Commercial, Inc.*, 348 S.W.3d 894 (Tex. 2011).

$24,886,990.95 plus post-judgment interest to ART, and $19,554,065.57, plus post-judgment interest to TCI, plus an addition $1,600,000 plus post-judgment interest in attorney's fees and $170,563.76 plus post-judgment interest in costs to Plaintiffs. In total, with interest, the judgment totals over $55,000,000.00

15.     Dynex Capital alleges that it is not liable for any of the damages resulting from the breaches of the $160 Million Commitment. Dynex Capital contends this, notwithstanding that newly discovery evidence establishes they have been paying the legal fees of Dynex Commercial for seventeen (17) years totaling "north of $10 million" in the words of Dynex Commercial and Dynex Capital's corporate representative, Stephen Benedetti, and agreed to be responsible for at least 20% of what now is more than a $55 million judgment. When Plaintiffs brought suit against Dynex Capital and Dynex Commercial, Dynex Commercial had substantial assets sufficient to satisfy any judgment Plaintiffs obtained against it. Subsequently, however, Dynex Commercial and Dynex Capital engaged in a series of transfers of Dynex Commercial's assets (the "Property") that have rendered Dynex Commercial insolvent. These transfers started in 1999, the year the underlying lawsuit was filed, and continued for the years leading up to the trial and the years after trial throughout the appellate process. Dynex Commercial's transfers only became known during the post-judgment discovery process when Plaintiffs uncovered one of the most flagrant cases of a judgment debtor fraudulently transferring millions of dollars of its assets to defraud a judgment creditor and engaging in fraud, including perpetrating a fraud not only on its creditors, but on the very Court that tried the case and entered the verdict. Dynex Capital, a publicly traded New York Stock Exchange Company, should be above reproach. But instead, they conspired, if not spear-headed, these fraudulent transfers of millions of dollars of assets, resulting in a gross miscarriage of justice as well as a fraud on TCI, and TCI's shareholders, and others.

16.     The story of fraud and deceit began to unravel when TCI started serving post-judgment discovery on Dynex Capital and Dynex Commercial and after the federal court in the Northern District of Texas appointed a Receiver over ART's claims.   On March 16, 2016, TCI served a Request for Production to Aid Enforcement of Judgment to Dynex Commercial ("Plaintiff's First Request") and a First Set of Interrogatories to Aid in the Enforcement of Judgment to Dynex Commercial ("Plaintiff's First Interrogatories").[3]   In response, Dynex Commercial filed answers and objections which were served on May 2, 2016.[4]

17.     On March 24, 2016, TCI served a Notice of Intent to Service Subpoena on Non-Party Dynex Capital ("Subpoena) requesting the production of documents.[5]   Dynex Capital also filed answers and objections to this Subpoena on May 6, 2016. [6]

18.     The objections lodged were not proper, designed to mislead the Court, obstruct the discovery process, delay the proceedings and effectively deny Plaintiffs any discovery.   TCI requested that Dynex Commercial amend its Objections and release the documents and information requested as Dynex Commercial's objections to both the document requests and interrogatories violated the Texas Rules of Civil Procedure and are woefully deficient.

19.     The post-judgment discovery served on Dynex was to aid in the enforcement of the Final Judgment entered in Plaintiffs' favor.   The discovery requests were reasonably calculated to lead to the discovery of documents that would lead to admissible evidence which would assist

---

[3] *See* Plaintiff's First Request for Production to Aid in Enforcement of Judgment and Plaintiff's First Set of Interrogatories to Aid in the Enforcement of Judgment, dated March 16, 2016 (the "Requests"), a true and correct copy of which is attached hereto as Exhibit 1.

[4] *See* Dynex's Answers and Objections to First Set of Interrogatories to Aid in the Enforcement of Judgment and Responses and Objections to Request for Production to Aid Enforcement of Judgment (the "Objections"), a true and correct copy of which are attached hereto as Exhibit 2.

[5] *See* Plaintiff's Notice of Intent to Service Subpoena on Non-Party, dated March 24, 2016 (the "Requests"), a true and correct copy of which is attached hereto as Exhibit 3.

[6] *See* Non-Party Dynex Capital, Inc.'s Objections and Responses to Plaintiff's Subpoena, dated May 6, 2016 (the "Objections to Requests"), a true and correct copy of which is attached hereto as Exhibit 4.

---

**PLAINTIFFS' FIRST AMENDED COMPLAINT – Page 6**

Plaintiffs in the enforcement of the Court's Final Judgment. The information sought was necessary so that Plaintiffs could effectively enforce their Final Judgment, which has not been paid.

20.     In response to Plaintiff's discovery requests, Dynex asserted a number of spurious objections and attempted to relitigate the underlying case. Essentially, Dynex's objections constituted an impermissible collateral attack on this Court's Final Judgment.

21.     Dynex Commercial's responses to Plaintiff's First Interrogatories ("Dynex Commercial's Interrogatory Answers") began with prophylactic "general objections" which are not proper, especially in the context of post-judgment discovery. Texas Rule of Civil Procedure 193.1 provides that a responding party's objections must be preceded by the request to which they apply. General objections that are not preceded by, or address specific requests, as opposed to definitions or instructions are, therefore, invalid as a matter of law.

22.     With respect to its specific responses to individual interrogatories, Dynex Commercial answered "none" or "not applicable" to 61 of the 63 interrogatories, which Plaintiffs contended constituted discovery abuse on its face. Dynex Commercial's answers were wholly deficient and contravened the Texas Rules of Civil Procedure. Dynex's bad-faith approach to Plaintiff's post-judgment discovery was consistent with Dynex's course of conduct all along to deny Plaintiffs any of their rightful recovery.

23.     Most, if not all, of the 230 objections to Plaintiff's First Requests of Production contained "boiler plate" objections that the requests were overly broad, unduly burdensome, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Dynex Commercial's specific written responses to Plaintiff's First Requests were virtually identical — Dynex Commercial objected over and over again on the grounds that the requests were overly broad, unduly burdensome, harassing, vague, and ambiguous. Dynex Commercial failed to

provide any factual or legal support for its objections, nor did it identify what documents produced were responsive to which request. Dynex Commercial also objected to nearly every request as irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Texas Rule of Civil Procedure 192.3 provides, however, that discovery is appropriate if the information sought appears reasonably calculated to lead to the discovery of admissible evidence. This was not an appropriate objection.

24.     Dynex Capital's responses to the First Requests for Production began with a page of prophylactic "general objections." As previously stated, objections must be preceded by the request to which they apply, so Dynex Capital's general objections were, likewise invalid as a matter of law and again just another example of Dynex Capital's attempt to avoid paying Plaintiffs' Final Judgment. All 230 objections to Plaintiff's First Requests contained the 'boiler-plate" objection that the request was overly broad, unduly burdensome, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence, or Dynex Capital claimed it had "no responsive documents." Dynex Capital failed to provide any factual or legal support for its objections, nor did it identify what documents produced are responsive to which request and Dynex Capital's objections were void as a matter of law.

25.     Plaintiffs filed a motion to compel the discovery they requested. At the hearing on Plaintiffs' Motion, Plaintiffs were able to expose Dynex's fraud and Dynex's continued attempts to avoid compensating Plaintiffs for their damages, now contained in the Final Judgment. Plaintiffs' discovery was served in a very specific manner so as to yield documents spanning nearly two decades. In February 2004, literally the day before the verdict was rendered against Dynex Commercial, Plaintiff researched and printed out every UCC filing found online that reflected assets owned by Dynex Commercial and placed them in a notebook (the "Notebook"). These

searches covered transactions as far back as the late 1990's through February 9, 2004, the date on which the searches were conducted.  What resulted was evidence of potentially Tens of Millions of Dollars in secured positions on real estate that were titled in the name of Dynex Commercial and/or Dynex Capital, as well as assignments from Dynex Commercial to Dynex Capital.  These UCC filings even covered property in which Dynex Commercial had taken a secured position on property owned by one or more of the Plaintiffs.

26.     What Dynex did not know is that the evidence in the Notebook was in existence when they were answering the discovery being served thirteen (13) years later.  The responses, categorical denials, and representations that are being engaged in by Dynex constitute a fraud of epic proportions.  Representations made in Court on the record, only to be exposed by the evidence in the Notebook of UCC filings prepared thirteen (13) years before, were front and center at the hearing on TCI's motion to compel and for sanctions.  Dynex was caught red-handed.  They had perpetrated a fraud that they never thought would be uncovered and that they thought they could get away with, but they couldn't. The truth was exposed.

27.     On February 27, 2017, the Honorable Martin Hoffman entered an Order on Plaintiff's motion to compel against Dynex Capital, as follows:

> IT IS THEREFORE ORDERED that Dynex Capital shall amend its objections and responses to Plaintiff's First Request for Production and shall produce any additional responsive documents to Plaintiff's First Request for Production by March 1, 2017, including, but not limited to, all documents relating to the attached UCC filings and the real property, parties, and transactions referenced in Exhibit "B," which is attached hereto and is fully incorporated herein by reference, and any other related transaction.

> IT IS FURTHER ORDERED that Dynex Capital shall produce all financial information requested that references or relates to Dynex Commercial, Inc. n/k/a DCI Commercial, Inc. by March 1, 2017.[7]

---

[7]*See* Agreed Order, entered on February 27, 2017, attached hereto as Exhibit 5.

28.     On February 28, 2017, the Honorable Martin Hoffman entered an Order on

Plaintiff's motion to compel against Dynex Commercial, as follows:

> Dynex Commercial has agreed to withdraw all of its objections, both specific and
> general objections, to Plaintiffs First Request for Production to Aid Enforcement of
> Judgment and Plaintiffs First Set of Interrogatories to Aid in the Enforcement of
> Judgment to Dynex Commercial, Inc. ("Plaintiffs First Set of Interrogatories")
> served on March 16, 2016 ("Plaintiffs First Request for Production"). Dynex
> Commercial has agreed to either respond to each request contained in Plaintiffs
> First Request for Production by either stating: (1) that after a diligent search, no
> items have been identified that are responsive to Plaintiffs First Request for
> Production, or (2) that Dynex Commercial will produce documents responsive to
> Plaintiffs First Request for Production.
>
> Dynex Commercial further agrees that it will amend its responses to Plaintiffs First
> Request for Production by February 6, 2017, and its responses to Plaintiffs First Set of
> Interrogatories by March 14, 2017.
>
> IT IS THEREFORE ORDERED that Dynex Commercial amend its responses to
> Plaintiffs First Request for Production and produce all responsive documents,
> including, but not limited to, all documents relating to the attached UCC filings and the
> real property, parties, and transactions referenced in Exhibit "B," which is attached
> hereto and is fully incorporated herein by reference, to Plaintiff's First Request for
> Production by February 6, 2017, and amend its responses to Plaintiffs First Set of
> Interrogatories to March 14, 2017.[8]

29.     Dynex Commercial is justly indebted to Plaintiffs.  The amount of the debt is

liquidated.    The total damages as of the filing of this case are $448,899.59 plus post-judgment

interest to BCM, $24,886,990.95 plus post-judgment interest to ART, and $19,554,065.57 plus

post-judgment interest to TCI, plus an addition $1,600,000 plus post-judgment interest in

attorney's fees and $170,563.76 plus post-judgment interest in costs to Plaintiffs.   The post-

judgment interest began to run on July 20, 2015 at the rate of 5% per annum compounded

annually.[9]   The Final Judgment is final, valid, subsisting, and remains unpaid and exceeds

$55,000,000.00.

---

[8]*See* Order, entered on February 28, 2017, attached hereto as Exhibit 6.
[9]A true and correct copy of the Final Judgment is attached hereto as Exhibit 7 and is incorporated herein by
reference as if set forth in full.

---

30.     After Dynex Commercial was sued by Plaintiffs it transferred all or part of the Property to Dynex Capital or other affiliates in order to place the Property out of the reach of Dynex Commercial's creditors, including Plaintiffs.

31.     Defendants have conspired to defraud their creditors, including Plaintiffs, and to perpetrate a fraud on the Court and the Federal Court's Receiver.

32.     Upon entry of the Judgment, Plaintiffs waited the requisite time period for Dynex Commercial to post a bond. No bond was posted. Plaintiffs retained counsel and began pursing post judgment discovery.

33.     Despite the Orders from the State Court Judge, which are attached hereto as Exhibits 5 and 6, on Plaintiff's Motion to Compel, Dynex Commercial and Dynex Capital continue to engage in discovery abuse and other acts of contempt in the State Action. Dynex Capital continued to hide behind "boilerplate objections" and otherwise conceal responsive, relevant documents. It is clear now that the Dynex Entities have either refused to comply with the Court's Orders in the State Action and/or they have intentionally and systematically destroyed evidence relevant to Plaintiff's claims against them and the judgment itself. Plaintiffs have been forced to file a Motion requesting an Order to Show Cause and for Contempt and have requested that the Court in the State Action order the Dynex Entities to appear and show cause why they should not be held in contempt of the Court's Orders for their discovery abuses. On February 26, 2018, the State Court Judge entered an order granting Plaintiffs' motion for order to show cause and for contempt which states:

> It is ORDERED that the clerk issue notice to Dynex Commercial, Inc. n/k/a DCI Commercial, Inc. and Dynex Capital, Inc. to appear, and Dynex Commercial, Inc. n/k/a DCI Commercial, Inc. and Dynex Capital, Inc. are hereby ORDERED to appear before this Court on April 30, 2018 at 4:00 p.m., at the 68th Judicial District Court of Dallas County, Texas, to show cause why Dynex Commercial, Inc. n/k/a DCI Commercial, Inc. and Dynex Capital, Inc. should not be held in contempt for

disobedience of this Court's January 27, 207 [sic], February 27, 2017, and February 28, 2017 Orders, attached as Exhibit "1" "10" and "11" respectively to Plaintiffs' Motion for Order to Show Cause and for Contempt as alleged in Plaintiffs' Motion for Order to Sow Cause and for Contempt.

SIGNED on February 26, 2018.[10]

34.     In connection with the Order to Show Cause, the Texas State Court ordered discovery and the deposition of a corporate representative of Dynex Commercial and Dynex Capital to testify.

35.     On April 24, 2018, Stephen Benedetti ("Benedetti") was produced for deposition in the State Action in connection with an upcoming hearing on the contempt motion. The motion for contempt and for sanctions hearing commenced on May 7, 2018. It was continued after a half day of argument and testimony to July 2, 2018. Dynex Commercial and Dynex Capital produced him for deposition as a corporate representative as well as in his individual capacity in the Texas State Court Case.[11]

36.     Benedetti was produced in the State Action to testify about all of the subject matters designed by Plaintiffs which included the following subject matter areas:

1.      Document filing, retention and destruction policies and protocols for Dynex Commercial from 1999 to present;

2.      Document filing, retention and destruction policies for Dynex Capital from 1999 to present;

3.      Identity of persons responsible for document filing, retention and destruction policies for Dynex Commercial from 1999 to present;

4.      Identity of persons responsible for document filing, retention and destruction policies for Dynex Capital from 1999 to present;

---

[10]*See* Order Granting Plaintiffs' Motion for Order to Show Cause and for Contempt, entered on February 26, 2018, attached hereto as Exhibit 8.

[11]*See* Deposition transcripts of Stephen Benedetti ("Benedetti Depo."), taken April 24 and 25, 2018, at p. 7, l. 23-p. 8, l. 8. Attached hereto as Exhibit 9 are deposition excerpts in short form of the deposition of Mr. Bendetti. Attached hereto as Exhibit 10 is the complete (condensed) deposition transcripts of Mr. Benedetti with deposition exhibits attached. We have pulled documents marked "confidential" from the deposition exhibits.

---

5.      Identity of persons responsible for asset transfer/sale and or disposition for Dynex Commercial from 1999 to present;

6.      Identity of persons responsible for asset transfer/sale and or disposition for Dynex Capital from 1999 to present;

7.      Location of loan files, underwriting files, appraisals, title documents, as well as any files regarding asset sales or other disposition of properties that Dynex Commercial was servicing or otherwise had an interest in from 1999 to present;

8.      Location of loan files, underwriting files, appraisals, title documents, as well as any files regarding asset sales or other disposition of properties that Dynex Capital was servicing or otherwise had an interest in from 1999 to present;

9.      Disposition of funds received for all sale, transfer of other disposition of real estate assets of Dynex Commercial from 1999 to present;

10.      Disposition of funds received for all sale, transfer of other disposition of real estate assets of Dynex Capital from 1999 to present;

11.      Corporate structure of Dynex Commercial from 1999 to present;

12.      Corporate structure of Dynex Capital from 1999 to present;

13.      Name and corporate positions all persons with knowledge of documents, including all communications, evidencing the location of all loan files of Dynex Commercial related to the UCC-1 statements attached to Exhibit "6" to Plaintiffs' Motion for Order to Show Cause and for Contempt

14.      Name and corporate positions all persons with knowledge of documents, including all communications, evidencing the location of all loan files of Dynex Capital related to the UCC-1 statements attached to Exhibit "6" to Plaintiffs' Motion for Order to Show Cause and for Contempt;

15.      Name and corporate positions all persons with knowledge of documents, including all communications, related to the UCC-1 statements attached to Exhibit "6" to Plaintiffs' Motion for Order to Show Cause and for Contempt;

16.      Name and corporate positions all persons with knowledge of documents, including all written assignments, related to the UCC-1 statements attached to Exhibit "6" to Plaintiffs' Motion for Order to Show Cause and for Contempt;

17.      Name and corporate positions all persons with knowledge of documents, including all appraisals on real property, related to the UCC-1 statements attached to Exhibit "6" to Plaintiffs' Motion for Order to Show Cause and for Contempt;

18.     Name and corporate positions all persons with knowledge of documents, including all security agreements, related to the UCC-1 statements attached to Exhibit "6" to Plaintiffs' Motion for Order to Show Cause and for Contempt;

19.     Name and corporate positions all persons with knowledge of documents, including all communications, of any instruction given regarding the storage of the documents and other information (whether electronically stored on a computer or physically stored within a warehouse or other structure) relating to the underlying transactions referenced in the UCC-1 statements attached to Exhibit "6" to Plaintiffs' Motion for Order to Show Cause and for Contempt;

20.     Name and corporate positions all persons with knowledge of documents, including all communications relating to any instruction to destroy, alter, or purge any of the documents or other information relating to the underlying transactions referenced in the UCC-1 statements attached to Exhibit "6" to Plaintiffs' Motion for Order to Show Cause and for Contempt;

21.     The loans, agreements, and transactions evidenced in Exhibit the UCC-1 statements attached to Exhibit "6" to Plaintiffs' Motion for Order to Show Cause and for Contempt; and,

22.     The financial institutions that participated in the loans evidenced in the UCC-1 statements attached to Exhibit "6" to Plaintiffs' Motion for Order to Show Cause and for Contempt, the persons at those financial institutions that negotiated the transactions, and the structure of the investment.[12]

37.     In addition, Benedetti also testified that he assisted in gathering and producing all documents.[13] The State Action that resulted in the more than $50 million judgment was filed on April 15, 1999.   Benedetti testified that Dynex Commercial had assets in the year 2000.[14] However, by 2001, he testified that Dynex Commercial had no assets.[15] By 2001, Dynex Commercial had ceased operations and all of its assets would have been distributed to its parent.[16]

---

[12]*See* Benedetti Depo. at p. 21, l. 25-p. 22, l. 17.
[13]*See* Benedetti Depo. at p. 25, ll. 6-19.
[14]*See* Benedetti Depo. at p. 30, ll. 13-17.
[15]*See* Benedetti Depo. at p. 30, ll. 18-19.
[16]*See* Benedetti Depo. at p. 30, l. 20-p. 31, l. 4.
(footnote continued)

---

38.    Benedetti testified that in 2001, during the pendency of the lawsuit, Dynex had no assets to satisfy a judgment.[17]  During that time period, Benedetti was a Vice President of Dynex Commercial and then became the President.[18]  Benedetti also was an officer of Dynex Capital and worked for Dynex Capital.[19]  Benedetti testified that contrary to Dynex Commerical's counsel's representation in open court in 2004, when the jury's verdict came back with an approximately $30 million judgment, Dynex Commercial had no ability to pay that judgment.[20]

39.    Benedetti confirmed that the size of the loan portfolio that Dynex Commercial was servicing in 1999 when the lawsuit was filed was $600 million.[21]  This testimony is direct evidence that Dynex Capital and Dynex Commercial stripped Dynex Commercial of its assets through fraudulent transfers from 1999-2004 prior to the more than $30 million judgment entered. Benedetti later testified that four years later, that $600 million had been reduced to "zero" before the case went to trial in February 2004.

40.    Benedetti testified that over 100 boxes of documents were turned over to their lawyers; however, that turned out not to be true.[22]  Benedetti admitted that key financial documents may have been destroyed.[23]  Benedetti knew the lawsuit was pending against both Dynex Capital and Dynex Commercial and that during the case, Dynex Capital was a party and was even, at one point, named in the judgment.[24]  Benedetti testified, as follows:

> Q. Okay. You said by the end of 2000, Dynex Commercial didn't have any assets left and it ceased operations, correct?
>
> A. By the end of 2000, yes, it had ceased operations.

---

[17]*See* Benedetti Depo. at p. 36, l. 22-p. 37, l. 5.
[18]*See* Benedetti Depo. at p. 38, ll. 3-4; p. 39, ll. 12-13.
[19]*See* Benedetti Depo. at p. 40, ll. 2-3; p. 41, ll. 2-3.
[20]*See* Benedetti Depo. at p. 48, ll. 13-17.
[21]*See* Benedetti Depo. at p. 49, ll. 2-8.
[22]*See* Benedetti Depo. at p. 56, ll. 3-20; p. 58, ll. 3-19.
[23]*See* Benedetti Depo. at p. 58, l. 20-p. 59, l. 22.
[24]*See* Benedetti Depo. at p. 60, l. 16-p. 61, l. 6.; p. 61, ll. 12-24.

Q. So in 2001, right after New Year's, it's the beginning of 2001, Dynex -- Dynex Commercial had no loans. They were servicing no loans. All the loans originated had been transferred out, just like you said in your response to Interrogatory Number 7, right? They had been transferred out, correct?

A. By the end of 2000, yeah, everything had been transferred out.

Q. And the only documents that Dynex Commercial maintained regarding those loans, because, as you said in your response, you transferred all the other documents to the investors, were the loan underwriting files, correct?

A. It also says that the original loan files were generally transferred to the investors. So some of -- copies of -- sometimes copies of those loan files were maintained. So it was a mix.[25]

41.     Benedetti testified that Dynex Capital was funding the litigation costs at the same

time Dynex Commercial was siphoning off all of its assets during the pendency of the underlying

Texas State Court Case:

Q. Isn't it true that there was a litigation sharing agreement that lasted through the trial date in 2004 between Dynex Commercial and Dynex Capital?

A. There's a litigation cost sharing agreement between Commercial and Capital, yes.
Q. And Capital was paying Commercial's fees through 2004, correct?

A. You know, Commercial would have paid its fees until it didn't have the capacity to pay fees and then Capital -- I think that's when we entered the agreement, and then Capital would have paid them, yes.[26]

Q. Well, clearly Commercial is getting a benefit of having its legal fees paid for at least two years and maybe more, correct?

A. Commercial is -- there's an obligation that's being created on behalf of Commercial to repay Capital under the litigation cost sharing agreement.[27]

---

[25]*See* Benedetti Depo. at p. 91, l. 13-p. 92, l. 9.
[26]*See* Benedetti Depo. at p. 104, l. 17-p. 105, l. 2.
[27]*See* Benedetti Depo. at p. 106, ll. 10-15.

Q. Well, you testified under oath that no tax return was available after a diligent search for 2002.

A. I did. I also testified that I believe that we had and I -- we searched -- we contacted the IRS, we contacted various states to try to get copies of those. We just didn't retain them.

Q. So Dynex Commercial is in litigation against my client in 2002, 2003 and 2004 and it's been up on appeal in this litigation for the last 10 years, and Dynex Commercial didn't even retain its tax returns that it filed in 2002 or later? Is that -- yes or no? Is that right?

A. No, it's not right.[28]

Q. You didn't produce any tax returns to my clients, did you?
A. We didn't because we were unable to get copies of those state returns.

Q. And you understand you're a judgment debtor of my client to the tune of over $50 million, right?[29]

A. Yes, I understand.[30]

Q. And it's your testimony that Dynex Commercial, who's received more than a million dollars in benefit by receiving its legal fees being paid, has no intention of paying that back to Dynex Capital? In fact, they can't because they don't have any money; isn't that right?

A. I don't have any -- I mean, Dynex Commercial is -- you know, does not have an intent to pay the money back because it cannot. It is still a -- it is still recording an obligation to pay the money back under the litigation cost sharing agreement.

Q. Even though it has no way of paying it back, right?

A. That's correct.

Q. Isn't that a sham loan?[31]

A. Isn't what a sham loan?

---

[28]*See* Benedetti Depo. at p. 108, ll. 9-21.
[29]*See* Benedetti Depo. at p. 109, ll. 6-11.
[30]*See* Benedetti Depo. at p. 109, l. 21.
[31]*See* Benedetti Depo. at p. 111, l. 19-p. 112, l. 7.

Q. Isn't it a sham? Isn't that just a -- isn't that an artifice? Isn't that a fake loan? Dynex Capital is loaning money to Dynex Commercial and booking it as a loan under a litigation cost sharing agreement when Dynex Capital, a publicly traded company on the New York Stock Exchange, and Dynex Commercial, the entity who's receiving the benefit of hundreds of thousands of dollars if not millions of dollars over a decade has no way of paying it back and no intention of paying it back?[32]

Q. Isn't it an artifice? Isn't it a fake loan?

A. It's -- the fees are being paid pursuant to that agreement. That agreement was collateralized with counterclaims against your defendant and others.[33]

42.     Benedetti was asked whether the Dynex Commercial advance was a "sham loan" and he agreed there was no way it could pay Dynex Capital back.  The counterclaim that was the alleged "collateral" on the Litigation Sharing Agreement, was lost and has never been viable to pay Dynex Commercial back:

Q. And what counterclaim was that?

A. Dynex Commercial had a counterclaim against your client for failure to deliver loans under the $160 million master commitment. So that –

Q. And they lost that counterclaim in 2004, correct?
A. In 2004, that counterclaim was lost.

Q. And it never was reversed on appeal like the $50 million judgment my client has now, was it?

A. To my knowledge, it was not.

Q. You're paying Mr. Patton's firm, right? Dynex Capital is paying -- as the corporate rep for Dynex Capital, your testimony is Dynex Capital is paying Mr. Patton and Mr. Tillotson's firm to represent Dynex Commercial in this case, correct?

A. Yes.

---

[32]See Benedetti Depo. at p. 112, ll. 9-20.
[33]See Benedetti Depo. at p. 112, l. 22-p. 113, l. 1.

Q. And Dynex Capital, the publicly traded company on the New York Stock Exchange, is also paying Mr. Taylor's firm, Hunton & Williams, to represent Dynex Capital, correct?

A. Yes. [34]

43.     Dynex Capital and Dynex Commercial entered into the Litigation Cost Sharing Agreement whereby Dynex Capital contracted to pay all of Dynex Commercial's litigation expenses which spanned over 18 years.[35]   Dynex Commercial carried a payable on its balance sheet for the litigation expenses advanced from Dynex Capital.[36]   Dynex Capital and Dynex Commercial refused to produce any documentation regarding that agreement in post-judgment discovery.[37]  This document termed a "Litigation Cost Sharing Agreement" was designed to have Dynex Capital pay all of Dynex Commercial's legal fees, while Dynex Commercial siphoned off its assets to various Dynex Capital and Dynex Capital affiliates, which ultimately exceeded $10 million in legal fees.  This document aided Dynex Capital in hiding the company and continuing fraud that had occurred for nearly two decades.

44.     As for that UCC-1 Notebook, Plaintiffs presented Benedetti with the UCC-1 Notebook of transactions relating to Dynex Capital and Dynex Commercial that was attached to the State Action Court Orders and incorporated into those Orders.[38]  Throughout the testimony of Benedetti, he confirms over and over again that Dynex Commercial was the "secured party" on these transactions, and in numerous instances that Dynex Commercial designed the secured

---

[34]*See* Benedetti Depo. at p. 113, ll. 2-8.
[35]*See* Benedetti Depo. at p. 131, l. 25-p. 132, l. 15; p. 132, ll. 17-22.
[36]*See* Benedetti Depo. at p. 132, l. 24-p. 134, l. 13.
[37]*See* Benedetti Depo. at p. 135, l. 14-p. 136, l. 7; p. 136, l. 9-p. 137, l. 5; p. 137, ll. 7-19.
[38]*See* Agreed Order entered on February 27, 2017 and Order entered on February 28, 2017; *see also* Benedetti Depo. at p. 146, ll. 9-24.
(footnote continued)

interests in potentially $600 million worth of loans to Dynex Capital during the pendency of the case.[39]

45.     Benedetti also admitted that he and Dynex Capital and Dynex Commercial refused to produce documents despite the Court's Orders in the State Action.  There are documents that go directly to satisfying the judgment, Benedetti testified, as follows:

> Q. My clients requested back in March of 2016 for you to produce all documents that refer in any way, directly or indirectly, to any shares of stock owned by Dynex Commercial or in which Dynex Commercial claims an interest. Do you see that?
>
> A. Yes.
>
> Q. Between the time frame of April 15, 1999, the filing date of the lawsuit, through December 31, 2001, did you produce any documents relating to Request -- requested in Request Number 82?
>
> A. No.
>
> Q. Did any such documents exist between April 15, 1999 and December 31, 2001?
>
> A. Yes.
>
> Q. And you see that it says owned, not owns, right? Because it seems like there's a present tense/past tense argument that you guys are making. So you see it says owned, right?
>
> A. I'm not sure that changes the tone of the -- of the request –
>
> Q. Okay.
>
> A. -- or the period of the request.
>
> Q. Okay. You didn't produce any documents between April 15, 1999 and 12/31/2001 in response to 82. That's what you just said, correct?
>
> A. That's correct.

---

[39]*See* Benedetti Depo. at p. 152, ll. 8-20; p. 155, ll. 6-22; p. 156, l. 2-p. 157, l. 2; p. 157, ll. 8-13; p. 158, ll. 4-17; p. 172, l. 19-p. 173, l. 5; p. 173, l. 25-p. 174, l. 13; p. 177, ll. 13-21; p. 179, ll. 8-19; p. 180, ll. 1-4; p. 180, ll. 11-17; p. 231, l. 22-p. 232, l. 11.

Q. And those documents existed back then, correct?

A. For that time period, there was a stock ownership by Dynex Commercial.

Q. And that would be the same response for 83, which asks for all documents that refer in any way, directly or indirectly, to any bonds owned by Dynex Commercial or in which Dynex Commercial claims an interest; is that correct?

A. No.[40]

Q. Go to 92 on Page 30 -- on Page 30. All documents that refer in any way, directly or indirectly, to any unsatisfied judgment against Dynex Commercial or for which Dynex Commercial is liable. Do you see that?

A. Yes.

Q. Did you produce any documents relating to any unsatisfied judgment? Did you produce any documents to us relating to any unsatisfied judgment?
A. I believe so, yes.

Q. What did you produce; do you remember?
A. No.

Q. What unsatisfied judgment does Dynex Capital have against it?[41]

Q. I mean Dynex Commercial, excuse me.

A. Well, your -- your client's judgment. So we would have produced items related to that.

Q. And you don't remember what you produced in this -- in these rounds of discovery?

A. Litigation cost sharing agreement, one or two other documents I would suppose. I don't -- I don't -- I'm not sure --

Q. Do you know what was produced to my client at or around May 2016 from Dynex Commercial regarding the unsatisfied judgment that was entered by the court?

---

[40]*See* Benedetti Depo. at p. 253, l. 24-p. 255, l. 8.
[41]*See* Benedetti Depo. at p. 255, ll. 13-25.

A. Do I have specific knowledge of that right here and now? No. I'd have to go and look at the documents that we've produced.

Q. Do you know if you've produced anything one way or the other?

A. We did produce something.

Q. In May of 2016 regarding the judgment?

A. I thought we did. That would be my understanding.

Q. Do you know what you produced after the court entered the two orders –

A. No.

Q. -- that we marked?

A. Not on this particular one.

Q. Does Dynex Commercial have any assets as of today?

A. No.

Q. Other than that stuff you testified before lunch about the, I don't know, manuals and this and that? I mean, does it have any hard assets?

A. No.

Q. Does it have any cash?

A. No.

Q. Does it have any bank accounts?

A. No.

Q. Doesn't file tax returns anymore?

A. No.

Q. Doesn't have any receivables?

A. No.

Q. Is it owed any money?

A. No.

Q. Does it have any office furniture, computers, anything?

A. No.[42]

Q. All right. Question 108, all documents reflecting the purchase by all partners or shareholders of any interest in Dynex Capital since the date of formation to the present.[43]

Q. I'm sorry, Dynex Commercial since the date of formation to the present. Did you produce any of those documents in response to the requests served in March that you responded to in May?

A. It says here we didn't.

Q. Did such documents exist at some point in time?

A. All documents reflecting the purchase by all partners or shareholders of any interest in Dynex Commercial since the date of formation to the present. I would imagine at the initial formation of Dynex Commercial there would have been some shareholder purchase agreement. I'm not sure why that wasn't in the materials.

Q. So these documents you do have and you didn't produce them?

A. No, I'm saying if they weren't produced, they must -- I'm not sure why they weren't. It's typical you have a shareholder purchase agreement in a original formation, at least that's my experience. So I would have expected it to be in these documents. If it -- if it wasn't, there might not have been one or it might have been misplaced. I don't know.

Q. If you look at 109, all documents filed with the Internal Revenue Service, including, but not limited to, IRS Form 941 pertaining to quarterly earnings, tax withholdings, FICA withheld and Dynex Commercial's portion of FICA withheld. So this is all tax returns, everything relating to employees, any -- any tax -- any documents filed with the IRS. When was it -- when was it -- actually, did you produce such documents for the time period of April 15 through the present or did you not produce them because there was, according to you under oath, a date restriction from January 1, 2002 to the present?

---

[42]*See* Benedetti Depo. at p. 256, l. 2-p. 257, l. 22.
[43]*See* Benedetti Depo. at p. 262, ll. 8-11.

A. It says here, DCI states that no items have been identified after a diligent search that are responsive to this request.[44]

Q. That was from January 1, 2001 forward if you recall your own prior testimony. I'm talking about prior to January 1, 2002. Did Dynex Commercial file a tax return in 1999?

A. It would have filed as part of a consolidated group.

Q. Is that a yes?

A. Yes.
Q. Did you turn it over to me? You, Dynex Commercial, did you turn it over to me?

A. No.

Q. Did you file a tax return in 2000, you, Dynex Commercial?

A. Yes.

Q. Did you turn it over to me?

A. No.

Q. Did you file a tax return in 2001?

A. I would think we did, yes.

Q. Did you turn it over to me? You, Dynex Commercial, did you turn it over to me?

A. No.

Q. Did you turn over any employee documents regarding tax withholdings, FICA, et cetera or any other documents filed with the IRS for the years '99, 2000 or 2001?

A. No.[45]

---

[44]*See* Benedetti Depo. at p. 262, l. 13-p. 263, l. 25.
[45]*See* Benedetti Depo. at p. 265, l. 9-p. 266, l. 10.

46.     Benedetti testified that the email system in place during the pendency of the case, which 40-50 employees had access to, is missing and there is uncertainty whether it can be found. This is direct evidence of spoliation of evidence by the corporate representative of Dynex Commercial and Dynex Capital.  Benedetti testified, as follows:

> Q. I want to talk a little bit about the -- the email system that Dynex Commercial had in place from April 15, 1999 through 2004. Can you briefly describe the IT department, first at Dynex Commercial? What did your IT department consist of in April of 1999?
>
> A In April of '99 it would have been an IT department consisting of a -- a handful of individuals. I can't remember their names.
>
> Q And how many employees did Dynex Commercial have in April of 1999, generally? Just give me an estimate.
>
> A Forty to fifty.
>
> Q And all 40 to 50 -- and they were employed by Dynex Commercial, correct?
>
> A Yes.
>
> Q And all 40 employees used email; is that correct?
>
> A I really couldn't answer that question.
>
> Q So you're testifying today as the corporate rep of Dynex Commercial and you were apprized of the subject matters regarding document destruction, protocols, retention, et cetera, and as you sit here today you can't tell me if the 35 to 40 employees of Dynex Commercial used email?[46]
>
> A Forty to fifty. And I wouldn't have knowledge --
>
> Q Forty to fifty, I apologize.
>
> A I wouldn't have knowledge as to whether all 40 or 50 used email back then.
>
> Q Did they -- did everybody have email accounts?

---

[46]*See* Benedetti Depo. at p. 278, l. 14-p. 279, l. 12.

A They would have had access to email if they wanted to use it, absolutely.

Q So you're saying you had an email system, they had access to email, they could use it if they want to, but as you sit here today as the corporate representative of Dynex Commercial, you don't know how many of the employees were using email?

A I don't know.

Q Is that fair?

A I don't know how many people were using email back in like --

Q Did you use --

A -- 1999.

Q -- email?

A I'm sorry?

Q Did you use email in 1999?

A I had an email account in 1999.

Q So, moving forward, Dynex Commercial ceased operations -- I think you testified yesterday -- at the end of -- at the end of 2001; is that correct?

A End of 2000.

Q End of 2000. What happened to the emails -- the IT department and the email system?

A So, the -- there was essentially shared services amongst all the -- the entities where the systems department for the shared services would have maintained email accounts and emails for Commercial, they would have been saved. For the folks that used it, they would have been saved on the network or wherever they were stored. I think at the time they were stored on the network.

Q Where are the emails that were archived stored today?

A Whatever we have is either -- I can't say specifically. I can't remember, but it would have been either on the network or on a backup tape or some tape of some sorts.

Q And where would those backup tapes be today?

A We had a third party come in and take all the systems records and download them and everything. So I -- I don't know whether -- where we -- when we got them back and if we got them back where we put them, but they -- they had access to all that.

Q And who was the third-party vendor that did that?

A I don't remember who that third-party vendor was.

Q How would you be able to contact them to find out if they still have the backup?

A I -- I can go back and look to see what we -- some correspondence with them, I think.
Q If the judge says, Mr. Benedetti, can you go pull the backup tapes and the backup hard drive that has all the emails on it that the third party came and took off and stored for you and gave back to you, could you deliver those to the court, those backup tapes and hard drives with all the emails on it, or do you not know where they are?

A I can't say for sure I know where they are. I can say a copy of everything was taken by this third-party service, so that's where I would go. If the court asked me, I would say, okay, well, the third-party service has this, this is typical. So I would have them delivered.

Q And who's the third-party service?

A I need to refresh on that.

Q So as you sit here today you can't remember the third-party service that took everything and copied it and you don't know as you sit here today where to go to retrieve those materials. Is that a fair statement?

A I -- I don't know as I sit here today.[47]

He testified that he doesn't know where the entire email system back-up is.

---

[47]*See* Benedetti Depo. at p. 279, l. 15-p. 282, l. 20.

47.     The ownership of Dynex Commercial then shifts from Dynex Capital to Benedetti's company between the filing of the original Dynex case in 1999 and trial.  Benedetti testified he is the sole owner of ICD Holding which, through a series of transfers during the pendency of the State Action, he ended up owning 100% of the stock and ended up being the sole indirect owner of Dynex Commercial as ICD Holding owned 100% of Dynex Commercial.  He testified, as follows:

> Q This is a written consent in lieu of an annual meeting of the directors of DCI Commercial. Do you see that?
>
> A Yes.
>
> Q And its signed by you?
>
> A Yes.
>
> Q And what this document does is it -- it's in lieu of having a meeting where they are electing officers, correct -- or appointing officers, correct?
>
> A Yes.
>
> Q And this document makes you the president and treasurer of DCI Commercial, Inc. as of July 1, 2003, correct?
>
> A Yes.
>
> Q And that's your signature on the bottom of the first page?
>
> A That's my chicken scratch.
>
> Q And then the bottom of the second page?
> A That's my signature, yes.
>
> Q And ICD Holdings is the holding, singular -- is the sole shareholder of DCI Commercial, Inc., according to the second page. Do you see that? At the bottom it says sole shareholder ICD –
>
> A I'm sorry, I was looking in the document -- yes.[48]

---

[48]*See* Benedetti Depo. at p. 292, l. 2-p. 293, l. 1.

Q Who owns ICD Holding, Inc?

A I do.

Q Who owned it at this time?
A What's the date on this again?

Q July 1, 2003.

A I think it was just me.

Q So you own a hundred percent of the stock of ICD Holding, Inc., who owns a hundred percent of DCI Commercial, Inc; is that correct?

A Yes.[49]

48.     Benedetti, after testifying that the litigation costs owed to Dynex Capital, which he eventually says is over $10 million, was not a "payable." It is apparent that was a "sham loan" from Dynex Capital to Dynex Commercial to assist Dynex Commercial in avoiding a judgment, and ultimately paying any judgment. Documents produced by the Dynex entities, show it was in fact booked as a payable, contrary to Benedetti's prior testimony. Benedetti testifies, as follows:

Q And what is this?

A It looks to me to be a -- a balance sheet for -- for Dynex Commercial, Inc. for December 31st, 2001, December 31st, 2002, and December 31st, 2003. Actually, it might be a -- it might be a -- it might be a balance sheet and income statement.

Q And what's -- just taking a look at the line items, what is this debit and credit and what are the amounts reflected?

A It looks like the debits are legal expenses and the credit is -- says AP legal.

Q And what is -- what is this referring to?

A What is what referring to? I'm sorry.

---

[49]*See* Benedetti Depo. at p. 294, ll. 11-20.

Q The document you're holding. These numbers, what does it -- what do those numbers refer to?

A Legal expenses incurred by Dynex Commercial.[50]

Q And you remember yesterday when I was going through the requests that we served on Dynex Commercial and we had that one request that talked about accounts payable and you and I went back and forth and back and forth about how the legal fees that were owed from Dynex Commercial to Dynex Capital wasn't an account payable as you know it as an accountant, but that it was just a payable. And you had testified earlier in the day that it was a payable, but it wasn't an account payable. And we went back and forth and back and forth. What does A/P mean right in front of legal?

A Typically that means accounts payable.

Q Okay. Do you want to change your testimony, based on your document, from yesterday that the legal fees are an accounts payable?

A The classification in a -- in a financial statement such as this is not indicative of the true underlying nature of what it is. If you look at the litigation cost sharing agreement, these are advances that are being made to Dynex Commercial. So -- and regardless, even if it were, I believe we -- anything that would have been responsive, no matter if it -- your reading and my reading was already -- was already
produced so.

Q So your testimony yesterday that the money that was advanced by Dynex Capital to Dynex Commercial which Dynex Commercial owes back as a payable, is that off the table now?

A No. It's -- it's an advances payable or a –

Q Okay.

A -- contingency payable. It's not, in my world, an accounts payable, notwithstanding what this document says.

Q Notwithstanding what your document says?

---

[50]*See* Benedetti Depo. at p. 295, ll. 11-16.

A Right. This is just a simple classification for a simple balance sheet. The -- what the nature of the payable is is driven by what the documents say between the parties. So –

Q And you'll agree with me that A/P on your document means account payable?

A That is what it means, yes.[51]

49.     Benedetti goes on to testify about another balance sheet reflecting the significant dollars paid out from Dynex Capital to Dynex Commercial during the pendency of the underlying lawsuit which shows more money being fronted by Dynex Capital for Dynex Commercial's legal expenses.

Q All right. I'm showing you what's been marked as Exhibit 17. This is the document Dynex Commercial produced, correct?

A Yes.

Q What is this?

A It's just a little more detail to -- it's essentially the same as Exhibit 16 with a little more detail. It also reflects a ten -- ten dollars in cash whereas the Exhibit didn't have ten dollars in cash on it.

Q It's a balance sheet, right?

A Yeah, it's a balance sheet.

Q And can you tell the court on December 31, 2001 -- and let me just back up. This is Dynex Commercial, Inc.'s balance sheet as of 12/31/2001, correct?

A Yes. 12/31, 12/31/2002 and 12/31/2003, those three pages.

Q And this was, again, during the pendency of the lawsuit, correct?

A Yes.

Q So on December 31, 2001, how much cash did Dynex Commercial have in the bank?

---

[51]*See* Benedetti Depo. at p. 295, l. 23-p. 297, l. 16.

A It says here ten dollars.

Q What were the total current assets of Dynex -- Dynex Commercial?

A It says here ten dollars.

Q What were -- what were the liabilities on the legal payable line?

A 1,582,791.86.

Q What were the total liabilities of Dynex Commercial?

A 1,582,791.86.

Q To what entity did Dynex Commercial owe that liability?

A Dynex Capital.

Q If you go down to the equity, it says opening balance equity ten dollars. Do you see that?

A Yes.
Q And then it says net income and it's a negative 1,582,791.86, correct?

A Net income, yes.

Q So the total equity of this company was actually negative 1,582,781.86. 1,582,781.86 on 12/31/2001, correct?

A Yes.

Q That was during the pendency of the lawsuit, correct?

A It was.[52]

50.     Benedetti then further testifies that by the time the trial occurred in 2004, the

payable advanced by Dynex Capital to Dynex Commercial has reached $4,034,196.92:

Q Hand you what's been marked as Exhibit 18. Again, this was produced by Dynex Commercial, correct?

A Yes.

---

[52]*See* Benedetti Depo. at p. 298, l. 1-p. 299, l. 24.

Q It's your company's document, correct?

A Yes.

Q All right. What is this?

A It's a trial balance for December 31, 2004.

Q And what does it reflect?

A The -- the balances of the accounts -- active accounts for Dynex Commercial, Inc. for the -- for the year -- or as of December 31, 2004.

Q And the second line says A/P legal. Do you see that?

A I do.

Q And A/P means what?

A A/P means accounts payable.

Q And what is the credit balance?

A 4,034,196.92.

Q And why is that listed as a credit?

A Because it's a payable.

Q And that's a payable that's owed from what entity to what entity?

A This is a payable owed by Dynex Commercial, Inc. to Dynex Capital, Inc. under the litigation cost sharing agreement.[53]

Q So the $4,034,206 and 92 cents is the total amount as of December 31, 2004 owed by Dynex commercial to Dynex Capital, correct?

A That's what it appears to be, yes.[54]

---

[53]*See* Benedetti Depo. at p. 300, l. 2-p. 301, l. 1.
[54]*See* Benedetti Depo. at p. 302, ll. 1-4.

51.     Benedetti is then asked, "what legal fees were paid by Dynex Capital to Dynex Commercial after that:"

> Q Do you know what legal fees were paid after May 2004 beyond this 3.7 million or $3.5 million number?
>
> A What legal fees have been paid after?
>
> Q Yeah.
>
> A With specificity, I don't know.[55]

52.     Benedetti first says he doesn't know how much was paid out by Dynex Capital to Dynex Commercial in legal fees in the deposition, but later during the same deposition, he testified, after refreshing his recollection, it was over $10 million.[56]  In addition, as an example of how Dynex Commercial was transferring its assets to Dynex Capital and affiliates, Benedetti went on to say that in 2000, during the pendency of the underlying lawsuit, Dynex Commercial sold a $4.4 million loan to Heller Financial, Inc.[57]  And, of course, he says he cannot remember the specifics of the transaction, which was a re-occurring theme during the deposition testimony.[58]

53.     Benedetti admits that $111,393.52 worth of assets were sold to Dynex Capital from Dynex Commercial during the pendency of this lawsuit.[59]

54.     So, Dynex Capital's and Dynex Commercial's position is that Dynex Commercial is not the alter ego of Dynex Capital and they did not engage in fraudulent transfers and fraud, even through in 1999, when Dynex Commercial had $600 million in loans in its portfolio and, by time of trial in 2004, Dynex Capital had paid millions of dollars in legal fees on Dynex Commercial's behalf and, at the time of trial, Dynex Commercial had no assets and was out of

---

[55]*See* Benedetti Depo. at p. 304, ll. 9-14.
[56]*See* Benedetti Depo. at p. 365, l. 25-p. 366, l. 19.
[57]*See* Benedetti Depo. at p. 306, l. 15-p. 308, l. 12.
[58]*Id.*
[59]*See* Benedetti Depo. at p. 308, l. 16-p. 309, l. 9.

business.  Moreover, by 2015, Dynex Capital had paid out over $10 million in legal fees on Dynex Commercial's behalf and the "debt" under the Litigation Cost Sharing Agreement of over $10 million was owed by Dynex Commercial to Dynex Capital.

55.     Benedetti, a career mortgage executive for both Dynex Commercial and Dynex Capital, when asked what a UCC-1 financing statement was, actually answered initially, "I don't know."  Benedetti was designated by Dynex Commercial and Dynex Capital as their corporate representative to testify specifically about the UCC-1 Notebook attached to the Court's Orders in the State Action,[60] yet answered "I don't know" when it came to answering the axiomatic question of what is a UCC-1.  The relevant testimony is, as follows:

Q What is a UCC-1 financing statement?

A I don't know. I have a general sense, but I –

Q Give me your general sense as the corporate representative of Dynex Capital and Dynex Commercial. What is a UCC-1 financing statement?

A Not sure I can give it to you as a corporate rep, but I can give it to you as an individual, in my individual capacity.

Q Well, these UCCs were all covered by the subject matter area. So if you want to tell the court that you're not going to answer it in your capacity as a corporate rep of Dynex Capital and Commercial, that's fine. If you want to answer it in your individual capacity, go ahead.

A Okay. My understanding of a UCC is -- is it's a notice that there is a -- a security interest in a property that's filed at a particular state -- in a particular state.

Q And does the borrower file a UCC-1 financing statement or does a lender file a UCC-1 financing statement?

A Usually it's the party that has the -- the interest in -- a secured interest, is trying to establish a secured interest in property.[61]

---

[60]*See* Exhibits 5 and 6.
[61]*See* Benedetti Depo. at p. 318, l. 8-p. 319, l. 7.

56.     Benedetti was questioned specifically about the UCC-1 documents produced by Dynex Capital that related to the UCC-1 materials in the "UCC-1 Notebook" that was attached to the State Court Judge's Order.  Benedetti confirms that the UCC-1's showed at the time that Dynex Commercial was the "secured party."  Some of that testimony, and his responses, are, as follows:

Q This is Exhibit 26. And if you'll look at the bottom it says, DCI POST JUDGMENT 001381. Do you see that?

A Yes.

Q And this was produced by Dynex Commercial to the plaintiffs?

A Yes.

Q And it indicates that the secured party on this transaction is Dynex Commercial, Inc. under secured party in paragraph 4A, correct?

A That's what that says, yes.

Q Hand you what's been marked as Exhibit 28. This is a UCC financing statement change. This is for Parkland Pointe Limited Partnership. This is dated April 19th, 1999. The secured party is listed as Dynex Commercial. Do you see that?

A Yes.

Q And this is produced by Dynex Capital as evidenced by Bates number DX0001804, correct?

A Yes.

Q At the bottom of the page.

A Yes, yes. I'm sorry.

Q And then in paragraph -- and in paragraph three, the secured party is Dynex Commercial, Inc., correct?

A That's what it says, yes.

Q And if you turn to the next page, under secured party Russel Parish signs that document. Do you see that?

---

A Yes.

Q You're not disputing on this UCC-1 that Dynex Commercial is the secured party, are you?

A They signed as the secured party. But, you know, again, this is a legal document. They weren't, in fact, the secured party in this transaction.

Q So you're testimony is that even though the UCC-1 says Dynex Commercial is the secured party and even though Russel Parish, the vice-president, signed for Dynex Commercial as the secured party filing this UCC-1 financing statement, your testimony under oath is everything on this document is correct except the designation of Dynex Commercial as the secured party, correct?

A So this document is effecting what is the actual case and that is -- is that Dynex Capital is the secured party. So that's why they're making the assignment. [62]

57.     Benedetti further confirms that Dynex Commercial was actually assigning its

security interest in properties to Dynex Capital.  That testimony is, as follows:

Q I'm just going to go through the whole document. I'm sorry, we're going to be here longer than I thought. All right. So this is uniform commercial code financing statement change form UCC-1, correct?

A Three. UCC-3.

Q Correct?

A Yes.

Q And it was produced by Dynex Capital as evidenced by DX0001804, correct?

A Yes.

Q And you're the corporate rep of Dynex Capital, correct?

A Yes.

---

[62]*See* Benedetti Depo. at p. p. 319, l. 19-p. 320, l. 4; p. 322, l. 9-p. 323, l. 14; p. 323, ll. 16-19.

Q And in the deposition notice there are several categories where you agreed to be prepared to testify about UCCs and the UCCs attached to the court's order and a variety of other UCC paragraphs -- UCC subject matters, correct?

A Yes. I'd have to look at the specific language.

Q Hey, it's fine with me. We can do this as long as we need to do it to get it right. If you start -- if you look at paragraphs 14 through the end, they all relate to UCCs. You testified yesterday under oath that you were prepared to testify on each subject matter. I went through every one of them one by one and asked you if you prepared to testify on those subject matters and you said yes. You didn't qualify your answer. You said yes. So I'm asking you questions about the UCC-1. Do you see those subject matters, sir, in the deposition notice?

A I am prepared to talk about these subject matters, yes.

Q Okay. So let's start over. Exhibit 28 is uniform commercial code financing statement change form UCC-3, correct?

A It is.

Q And you're here to testify as the corporate representative of Dynex Capital, correct?

A I am, yes.

Q And Dynex Capital produced Exhibit 28, correct?

A Yes.

Q And it's evidenced by a Bates number at the bottom DX0001804, correct?

A Yes.

Q And the line -- the paragraph number one or the item number one says, Debtor (if personal) Last Name. Do you see that?

A Yes, sir.

Q And it says Parkland Pointe Limited Partnership is the debtor, correct?

A Yes.

Q And you're familiar with Parkland Pointe Limited Partnership, correct?

A Yes.

Q And Dynex Commercial, Inc. is the secured party on this UCC financing statement, aren't they?

A On this document they are, yes.

Q At the bottom it says, Total assignment. The assignee is Dynex Capital, Inc., correct?

A That's what it says, yes.

Q And is Dynex Capital, in fact, the assignee or is this document that you produced incorrect?

A I believe that this document is correct –

Q And –

A -- but I'm not sure. This would have been pulled or been a copy of something that was filed at the UCC -- at the secretary of state.
Q And so Dynex Capital is the assignee, correct?

A That's what it says here, yes.

Q And if you turn to the second page, this document produced by Dynex Capital is signed by Russel Parish. Who is Russel Parish?

A At that time he was vice-president of Dynex Commercial, Inc.

Q And his signature is on a page that is entitled UCC Signature Page, correct?

A Yes, it is.

Q And then there's a all caps underlined secured party colon. Do you see that?

A I do.

Q And underneath that it says, Dynex Commercial, Inc., a Virginia corporation, correct?

A Yes.

Q And in front of Mr. Parish' name it says by, b-y, and then it has his name signed, right?

A Yes.

Q That means that Russel Parish is signing on behalf of Dynex Commercial, Inc. as the vice-president, correct?

A That's what it means. [63]

58.    Benedetti goes on to confirm that Dynex Commercial had another security interest in a property and confirmed it was signed by Warren Wilkins, a Dynex Commercial officer.[64]

59.    After going off the record, Benedetti came back on the record and conceded on behalf of Dynex Commercial and Dynex Capital that Exhibits 34-68,[65] which are UCC-1's, were almost all business records as they were signed by Dynex officers and filed by Dynex Commercial and/or Dynex Capital, and that the documents showed Dynex Commercial as the secured party and, in many instances, that Dynex Commercial was assigning its security interest to Dynex Capital.[66]

60.    Dynex Capital produced a corporate structure that showed Dynex Capital owning 100% of the preferred stock in Dynex Holding, Inc. which owned 100% of the stock of Dynex Commercial.[67] Benedetti testified that Dynex Commercial terminated its corporate existence, Dynex Commercial was never reinstated, Benedetti confirmed the corporate existence had been terminated in 2006 and had never been reinstated, and Benedetti is the sole officer of Dynex

---

[63]*See* Benedetti Depo. at p. 323, l. 22-p. 326, l. 5; p. 326, l. 12-p. 327, l. 23.
[64]*See* Benedetti Depo. at p. p. 327, l. 25-p. 328, l. 11; p. 329, ll. 2-10.
[65]Deposition Exhibits 34-68 are attached hereto to the Benedetti Depo for the Court's review.
[66]*See* Benedetti Depo. at p. 339, l. 13-p. 343, l. 19., and Exhibits 34-68, UCC-1 Statements produced by Dynex Capital in the State Action, attached hereto to the Benedetti Depo.
[67]*See* Benedetti Depo. at p. 343, l. 22-p. 345, l. 4.
(footnote continued)

Commercial, and is the sole owner of the company that owned 100% of the stock of Dynex Commercial. And, when asked if Benedetti had no corporation to be an officer of any more, he responded, "That's correct, yes, sir." [68]

61.     Based on the testimony of Benedetti, the sole officer in charge of Dynex Commercial (who has been the sole officer in charge of that company since the early 2000s), whose deposition was given in the State Action as corporate representative of Dynex Commercial and Dynex Capital, it is clear that Dynex Commercial is the alter ego of Dynex Capital. With the extensive transfer of assets from Dynex Commercial to Dynex Capital or its related entities - - especially the assignments evidenced in the UCC-1s assigning security interests from Dynex Commercial - - as well as the examples we have given whereby hard assets and mortgages and/or commercial paper were transferred out of Dynex Commercial for the benefit of Dynex Capital or its affiliates, establish that a series of fraudulent transfers unbeknownst to Plaintiffs were taking place from the time the underlying case was filed on April 15, 1999 through and after the verdict was entered against Dynex Commercial in 2004. Benedetti's own words also show that the initial capitalization of Dynex Commercial was inadequate or simply a façade for Dynex Capital (its parent company at the time of the filing of the underlying lawsuit on April 15, 1999), that there was a non-payment of dividends by the corporation, that there was a siphoning of the funds by the shareholder, Dynex Capital and ultimately ICD Holding, which was controlled by Benedetti - - of funds of Dynex Commercial, that Dynex Commercial failed to observe any corporate formalities, that there was a non-functioning of officers and directors (underscored by the fact that Benedetti was making all of the decisions while working for and employed by Dynex Capital), there is an absence of corporate records, and that the corporation was merely a façade for Dynex Capital, its

---

[68]*See* Benedetti Depo. at p. p. 347, l. 14-p. 348, l. 10.

ultimate shareholder, which was operated at the direction for Benedetti, an officer of both Dynex Commercial, ICD Holding, and Dynex Capital.

62.     Dynex Commercial was servicing approximately $600 million worth of loans in 1999 when the underlying lawsuit was filed, and by the time the case went to trial in 2004, that number had fallen from $600 million to "zero." Dynex Capital paid over $10 million in legal fees on behalf of Dynex Commercial under a sham loan known as the Litigation Cost Sharing Agreement, while directing Dynex Commercial to shed its assets to "zero" before trial.

63.     In addition, extensive testimony from Benedetti demonstrates that not only did they fail to turn over documents in the State Action, but that a significant amount of documents and information including missing tax returns, stock ownership documents for Dynex Commercial, documents relating to the unsatisfying judgment, the Dynex Entities' entire email system, documents regarding bank accounts, receivables, office furniture, computers, loan files, IRS tax memos and backup information, and other relevant materials went missing, are missing, or were destroyed.  The failure to not only produce these materials, but not to even be able to locate them, and the confirmation from Benedetti that these documents were lost and/or destroyed, justifies an instruction to the jury that evidence in this matter has been spoliated.

64.     The Federal Court Receiver, well-known Dallas attorney, Michael Quilling, appointed by the Honorable Magistrate Paul Stickney, with the consent of ART, joins in this action. The Receiver has been appointed to collect the Final Judgment in favor of ART.[69]  The Final Judgment awards ART $24,886,990.95 in total damages plus post-judgment interest on said amount against Dynex Commercial from April 25, 2014 until paid at the rate of 5% per annum. The Receiver was duly appointed as a receiver to collect the Final Judgment for ART by the United

---

[69]*See* Order Appointing Federal Court Receiver attached hereto as Exhibit "11."

States District Court for the Northern District of Texas, Dallas Division, in civil action no. 3:99-CV-2355-N, in the case styled *ART Midwest, Inc., et al. v. David M. Clapper, et al.* A true and correct copy of the order appointing the Receiver is attached hereto as Exhibit "6" and is incorporated by reference herein for all purposes.

65.     Based upon the Benedetti deposition and pursuant to the clear terms of the Litigation Cost Sharing Agreement, by letter dated May 10, 2018 the Receiver made demand upon Dynex Capital for the immediate payment of $11,341,360.65. The Receiver contended that said amount represented 20% of the Judgment plush interest and costs, as contemplated by Section 1.2 of the Litigation Cost Sharing Agreement. Dynex Capital received the demand letter on May 10, 2018 but has not paid as demanded. Further proof that Dynex Commercial was the alter ego of Dynex Capital is that Dynex Capital agreed to be responsible for at least 20% of any judgment entered against its alter ego, Dynex Commercial.

66.     Accordingly, the Receiver filed a third party petition in the State Action for breach of contract against Dynex Capital.[70]

67.     Oddly, instead of responding to the Receiver's original demand, Dynex Capital filed yet another action regarding this subject matter in the United States District Court for the Eastern District of Virginia, Richmond Division (the "Virginia Action"). In this action, Dynex Capital sued the Receiver in its capacity as the Federal Court Receiver and seeks a "declaration of Dynex Capital's rights" under the Litigation Cost Sharing Agreement, a matter that is pending in the State Action. The filing of this Amended Complaint predates the Receiver's appearance date in the Virginia Action. These recent actions by Dynex Capital and Dynex Commercial are a blatant attempt to avoid the Orders entered by the State and Federal Court appointing the Receiver and to

---

[70]A true and correct copy of Third-Party Plaintiffs' Petition, filed on May 24, 2018, is attached hereto as Exhibit 12 and is incorporated by reference herein for all purposes.

forum shop to gain a procedural advantage.  These actions constitute a continuing and ongoing fraud.

## IV. SPOLIATION OF EVIDENCE INSTRUCTION

68.     Due to the direct evidence of spoliation of evidence, Plaintiffs request a spoliation instruction to the jury in this case because, under Texas law: (1) the accused parties had a duty to preserve the evidence; (2) the accused parties negligently or intentionally spoliated evidence; and, (3) the spoliation has prejudiced Plaintiffs' ability to present its case or defenses.

## V.  CAUSES OF ACTION

### Count One -- Fraudulent Transfer

69.     Plaintiffs incorporate and reallege the allegations set forth above.

70.     Dynex Commercial transferred its Property to Dynex Capital with the intent to hinder, delay, and defraud its creditors or other interested persons from obtaining that to which they are entitled which may become due.  This is obvious given the timing, i.e. during the pendency of the State Action.  Further, Dynex Capital admits that the transfer essentially pauperizes Dynex Capital by the very terms and admissions set forth in the Litigation Cost Sharing Agreement.[71] The transfers were for less than reasonably equivalent value.  At the time the transfers were made, Dynex Commercial was insolvent or became insolvent as a result of the transfer.[72]  Additionally, the transfer was made to an insider of Dynex Commercial when Dynex Commercial was insolvent, and the insider had reasonable cause to believe that Dynex Commercial was or would become insolvent.  It is clear that Dynex Capital had such a vested interest in preserving the now utterly

---

[71] The Litigation Cost Sharing Agreement admits that Dynex Capital "has limited financial resources and may be unable to fund certain costs associated with the litigation" as well as acknowledging that Dynex Commercial's "financial resources are limited" and that Dynex Capital acknowledges that Dynex Commercial's "active participation in the defense of the Litigation is critical to the ultimate successful outcome of such litigation."

[72] *Id.*

insolvent Dynex Commercial as a straw dog for Plaintiffs that it invested in excess of $10,000,000.00 in funding the litigation on behalf of Dynex Commercial under a sham "loan" arrangement knowing full well that such a debt, receivable or "litigation payable" as Mr. Benedetti chose to call it would never be repaid.

71.   In accordance with § 24.008 of the Texas Uniform Fraudulent Transfer Act, Plaintiffs seek the following remedies:

a.   avoidance of the transfers;

b.   an attachment against the Property;

c.   an injunction against further disposition by Defendants of the Property; and/or,

d.   appointment of a receiver to take charge of the Property.

72.   As a result of Defendants' fraudulent actions, Plaintiffs have suffered actual, consequential, incidental, and special damages, including loss of income and/or profits, in excess of the minimum jurisdictional limits of this Court.

### Count Two -- Civil Conspiracy

73.   Plaintiffs incorporate and reallege the allegations set forth above.

74.   Defendants entered into a combination of two or more persons to fraudulently transfer Dynex Commercial's Property. Defendants had a meeting of the minds regarding the object or course of action to be accomplished by the conspiracy. The object of the conspiracy was to hinder, delay, or defraud Dynex Commercial's creditors, including Plaintiffs. Defendants committed an unlawful act in furtherance of the conspiracy. This was made obvious by the very existence of the Litigation Cost Sharing Agreement. Had Dynex Capital not intended to complete emasculate Dynex Commercial of all assets, the Litigation Cost Sharing Agreement would have never been necessary.

75.    As a result of Defendants' conspiracy, Plaintiffs have suffered injury.

76.    Accordingly, Defendants should be held jointly and severally liable for any damages awarded to Plaintiff as a result of their conspiracy.

### *Count Three – Alter Ego*

77.    Plaintiffs incorporate and reallege the allegations set forth above.

78.    Defendants should be held jointly and severally liable for the causes of action set out herein as they constitute a single business enterprise and carry out a common business objective. Defendants have used similar names, similar employees, have common ownership, share financial or other resources, and/or operate out of the same office space. Defendant entities have been used to perpetrate a fraud. The controlling individuals of those entities should be held liable for the actions of the Defendant entities under each of the following grounds for disregarding the partnership or corporate form:

    a)   The forms were used as a sham to perpetrate a fraud;

    b)   The entities were organized and operated as a mere tool or business conduit of another ("alter ego");

    c)   The forms were used to evade an existing legal obligation;

    d)   Defendant entities were operated as a single business enterprise;

    e)   Defendants caused the Defendant entities to be used for the purpose of perpetrating an actual fraud, and Defendants perpetrated an actual fraud on the Plaintiff primarily for their direct benefit.

79.     Under Virginia law, a court can pierce the corporate veil upon a showing that: "(1) the corporation was the 'alter ego, alias, stooge, or dummy' of the other entity; and (2) 'the corporation was a device or sham used to disguise wrongs, obscure fraud, or conceal crime.'"[73]

> The factors considered significant to this inquiry are the initial capitalization of the corporation, the non-payment of dividends by the corporation, the siphoning of funds by the shareholder, the failure to observe corporate formalities, the non-functioning of officers and directors, the absence of corporate records and the fact that the corporation is merely a façade for the dominant shareholder.[74]

80.     Benedetti was the sole officer in charge of Dynex Commercial (and has been the sole officer in charge of that company since the early 2000s). With the extensive transfer of assets from Dynex Commercial to Dynex Capital or its related entities - - especially the assignments evidenced in the UCC-1s assigning security interests from Dynex Commercial - - as well as the evidence demonstrating that hard assets and mortgages and/or commercial paper were transferred out of Dynex Commercial for the benefit of Dynex Capital or its affiliates, establish that a series of fraudulent transfers unbeknownst to Plaintiffs were taking place from the time the underlying case was filed on April 15, 1999 through and after the verdict was entered against Dynex Commercial in 2004. Benedetti's testimony demonstrates that the initial capitalization of Dynex Commercial was inadequate or simply a façade for Dynex Capital (its parent company at the time of the filing of the underlying lawsuit on April 15, 1999), that there was a non-payment of dividends by the corporation, that there was a siphoning of the funds by the shareholder, Dynex Capital and ultimately ICD Holding, which was controlled by Benedetti - - of funds of Dynex Commercial, that Dynex Commercial failed to observe corporate formalities, that there was a non-functioning of officers and directors (underscored by the fact that Benedetti was making all of the

---

[73]*Oliver v. Omega Protein, Inc.*, 2011 WL 1044403, at *5 (E.D. Va. Jan. 31, 2011), rec. adopted, 2011 WL 976619 (E.D. Va. Mar. 17, 2011) (citation omitted).

[74]*U.S. for Use & Benefit of Skip Kirchdorfer, Inc. v. Aegis/Zublin Joint Venture*, 869 F. Supp. 387, 393 (E.D. Va. 1994) (citing *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 685-87 (4th Cir. 1976).

decisions while working for and employed by Dynex Capital), there is an absence of corporate records, and that the corporation was merely a façade for Dynex Capital, its ultimate shareholder, which was operated at the direction for Benedetti, an officer of both Dynex Commercial, ICD Holding, and Dynex Capital.

### Count Four -- Application for Writ of Attachment

81.    Plaintiffs incorporate and reallege the allegations set forth above.

82.    Dynex Commercial is justly indebted to Plaintiff.   The amount of the debt is liquidated.

83.    The requested attachment is not sought for the purpose of injuring or harassing Defendants.

84.    Plaintiff will probably lose this debt unless the writ of attachment is issued.

85.    Dynex Commercial has hidden its property for the purpose of defrauding its creditors.

86.    Dynex Commercial has disposed of all or part of its property with the intent to defraud its creditors.

87.    Dynex Commercial has or is about to convert all or part of its property into money for the purpose of placing it beyond the reach of its creditors.

88.    § 24.008(a)(2) of the Texas Uniform Fraudulent Transfer Act specifically authorizes the issuance of a writ of attachment against Defendants.

### Count Five – Receiver

89.    Plaintiffs incorporate and reallege the allegations set forth above.

90.    As of the filing of this petition, Dynex Capital's market cap is approximately $339,890,000.00 million and Plaintiffs' judgment represents approximately fifteen percent (15%)

---

of this value.  In order to preserve the Property and prevent the continued waste and dissipation

of the Property by Defendants, Plaintiffs seek the appointment of a receiver under Texas law to

rehabilitate Dynex Capital and Dynex Commercial on the following grounds:

   a.   The appointment of a receiver sought by Plaintiff is necessary to conserve
        the assets and business of Dynex Capital and Dynex Commercial and to
        avoid damage to the parties at interest;

   b.   All other remedies available at law or in equity, including the appointment
        of a receiver for the specific assets of Dynex Capital and Dynex
        Commercial are inadequate to protect Defendants and Plaintiffs;

   c.   The acts of the Defendants, as set forth herein above, are illegal, oppressive,
        or fraudulent; and

   d.   Equity requires the appointment of a receiver for the protection of Dynex
        Capital and Dynex Commercial and Plaintiffs.

   91.   As a result of the foregoing, Plaintiffs assert this cause of action for the purpose of

having a receiver appointed over Dynex Commercial and Dynex Capital and/or over the assets of

Dynex Commercial and Dynex Capital in order to prevent the continued waste of assets and abuse

of power by the Defendants.

   92.   Plaintiffs submit that the Court should appoint such person as the Court shall deem

qualified as an operating receiver over Dynex Commercial and Dynex Capital and/or over the

assets of Dynex Commercial and Dynex Capital with such powers as are provided by laws of

general applicability relating to receivers and such other powers deemed appropriate by the Court

to accomplish the rehabilitation. Plaintiffs recommend that the Court appoint Michael J. Quilling,

who has already been appointed as the receiver over ART, as the receiver over Dynex Commercial

and Dynex Capital.

### Count Six – Exemplary Damages

   93.   Plaintiffs incorporate and reallege the allegations set forth above.

---

94.     The acts complained of herein by Defendants were committed knowingly, willfully, intentionally, with actual awareness, or with actual malice.  In order to punish Defendants for such unconscionable overreaching and to deter such actions and/or omissions in the future, Plaintiffs seek recovery against all of the Defendants for exemplary damages as provided by Chapter 41 of the Texas Civil Practice and Remedies Code.  Plaintiffs request that exemplary damages be awarded against the Defendants of not less than three times the amount of Plaintiff's actual damages.

### Count Seven -- Attorneys' Fees

95.     Plaintiffs incorporate and reallege the allegations set forth above.

96.     In accordance with § 24.013 of the Texas Uniform Fraudulent Transfer Act, Plaintiffs are entitled to recover their reasonable attorneys' fees incurred in prosecuting this action.

97.     Accordingly, Plaintiffs seek recovery of an additional sum to compensate them for the reasonable attorneys' fees incurred in prosecuting this suit, with further and subsequent awards of attorneys' fees in the event of appeals from this Court.

**WHEREFORE, PREMISES CONSIDERED,** Plaintiffs respectfully pray that Defendants be cited to appear and answer this lawsuit; that on final trial hereof, Plaintiffs have and recover judgment against Defendants, for actual, consequential, and incidental damages in an amount that exceeds the minimum jurisdictional limits of this Court, with pre-judgment and post-judgment interest at the maximum rate allowed by law; that a judgment in favor of Plaintiffs for their reasonable and necessary attorneys' fees, expenses and costs through the trial of this matter, and additional sums determined to be reasonable and necessary through the filing of a motion for new trial and/or an appeal to the Dallas Court of Appeals or the Texas Supreme Court; that all

costs of Court be taxed against Defendants; and, for such other and further relief, both general and special, at law and in equity, to which Plaintiffs may be justly entitled.

Respectfully submitted,

By: /s/ W. Carter Boisvert _____
     **Lawrence J. Friedman**
     State Bar No. 07469300
     lfriedman@fflawoffice.com
     **Carter Boisvert**
     State Bar No. 24045519
     cboisvert@fflawoffice.com

**FRIEDMAN & FEIGER, L.L.P.**
5301 Spring Valley Road, Suite 200
Dallas, Texas 75254
(972) 788-1400 (Telephone)
(972) 788-2667 (Facsimile)

**ATTORNEYS FOR TCI and BCM**

and

Michael L. Gaubert
State Bar No. 00785903
michael@gaubertlawgroup.com
**GAUBERT LAW GROUP, PC**
5001 Spring Valley Road, Suite 500W
Dallas, Texas 75244
(972) 743-4909 (Telephone)
(214) 204-0094 (Facsimile)

**ATTORNEY FOR TCI**

and

Clark B. Will
State Bar No. 21502500
cbw@kilgorelaw.com
The Law Office of Clark B. Will, P.C.
Of Counsel to:
KILGORE & KILGORE, PLLC
3109 Carlisle Street
Dallas, Texas 78204
(214) 379-0834 (Telephone)
(214) 379-0838 (Facsimile)

**ATTORNEYS FOR MICHAEL J.
QUILLING, RECEIVER FOR ART**

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2018, I electronically filed the foregoing document with the Clerk of Court for the U.S. District Court for the Northern District of Texas, Dallas Division, using the electronic case filing system of the Court. The electronic case filing system will send a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept the Notice as service of this document by electronic means:

Michael L. Gaubert, Esq.
Gaubert Law Group, PC
5001 Spring Valley Road, Suite 500W
Dallas, Texas 75244
Telephone: (972) 743-4909
Facsimile: (214) 204-0094

Edward F. Fernandes, Esq.
Hunton & Williams, LLP
111 Congress Avenue, Suite 510
Austin, Texas 78701
Telephone: (512) 542-5000
Facsimile: (512) 542-5049

Clark B. Will, Esq.
The Law Office of Clark B. Will, PC
3109 Carlisle
Dallas, Texas 75204
Telephone: (214) 379-0834
Facsimile: (214) 379-0838

John C. Eichman, Esq.
Hunton & Williams, LLP
1445 Ross Avenue, Suite 3700
Dallas, Texas 75202
Telephone: (214) 979-3000
Facsimile: (214) 880-0011

Jeffrey M. Tillotson, Esq.
Tillotson Law
750 N. St. Paul Street, Suite 610
Dallas, Texas 75201
Telephone: (214) 382-3041
Facsimile: (214) 501-0731

s/ W. Carter Boisvert
**W. CARTER BOISVERT**