**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **BASIC CAPITAL MANAGEMENT, INC., TRANSCONTINENTAL REALTY INVESTORS, INC., and MICHAEL J. QUILLING as Court-Appointed Receiver for AMERICAN REALTY TRUST, INC.,** | |
| **Plaintiffs,** | |
| | **Civil Action No. 3:17-CV-1147-B** |
| **v.** | |
| **DYNEX CAPITAL, INC., and DYNEX COMMERCIAL, INC. n/k/a DCI COMMERCIAL, INC.,** | |
| **Defendants.** | |

## PLAINTIFFS' SECOND AMENDED COMPLAINT

**TO THE HONORABLE JUDGE OF SAID COURT:**

Plaintiffs Basic Capital Management, Inc. ("BCM"), Transcontinental Realty Investors, Inc. ("TCI"), and Michael J. Quilling as Court-Appointed Receiver for American Realty Trust, Inc. ("ART") (collectively "Plaintiffs"), file this Second Amended Complaint against Defendants Dynex Capital, Inc. ("Dynex Capital"), and Dynex Commercial, Inc. n/k/a DCI Commercial, Inc. ("Dynex Commercial") averring and alleging as follows:

### I. PARTIES

1. Plaintiff BCM is a Nevada corporation with its principal place of business in Dallas, Dallas County, Texas. BCM is authorized to do business in the State of Texas.

---

2.      Plaintiff TCI is a Nevada corporation with its principal place of business in Dallas, Dallas County, Texas.  TCI is also the successor of a merger with Continental Mortgage & Equity Trust ("CMET").  TCI is authorized to do business in the State of Texas.

3.      Plaintiff Michael J. Quilling was appointed as the Receiver for ART by the United States District Court for the Northern District of Texas in Case No. 3:99-CV-2355, *ART Midwest, Inc., et al. v. Clapper, et al.*, by written order on December 11, 2015, and empowered to exercise all rights and powers that would be exercisable by ART in the Dynex Judgment.  ART is a Georgia corporation with its principal place of business in Dallas, Dallas County, Texas.  ART is authorized to do business in the State of Texas.

4.      Defendant Dynex Capital is a Virginia corporation with its principal place of business in Glen Allen, Virginia. Dynex Capital and has appeared in this action although it has not as yet answered.

5.      Defendant Dynex Commercial is a Virginia corporation with its principal place of business in Glen Allen, Virginia and has made an appearance in this action although it has not as yet answered.

## II. <u>JURISDICTION AND VENUE</u>

6.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1332(a)(1) because this action is between citizens of different States and the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

7.      This Court has personal jurisdiction over Defendants because they have done and are doing business in the State of Texas, including the origination and servicing of loans to Texas residents secured by real property and personal property located in Texas; Defendants purposefully directed activities at Plaintiffs, who are residents of

Texas, and the litigation arises out of or relates to Defendants' activities directed at Plaintiffs in Texas; and Defendants have submitted to the jurisdiction of courts in Texas.

8.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b), 1441(a) and 1446(a) because a substantial part of the events or omissions occurred in this judicial district, Defendants are subject to the Court's personal jurisdiction in this district, and the matter was removed to this Court from the 68th Judicial District Court of Dallas County, Texas.

### III.  <u>BACKGROUND FACTS</u>

9.     Dynex Capital was incorporated in 1987 and was formerly known as Resource Mortgage Capital, Inc.  Dynex Capital is a publicly traded company on the New York Stock Exchange.  In the 1990s, Dynex Capital was a vertically integrated financial services company, which directly and through its subsidiaries originated mortgage loans or purchased mortgage loans in bulk in the market.  Loans funded through the company's operations were generally pooled and pledged, i.e., securitized, as collateral for bonds. Dynex through its subsidiaries typically serviced the loans in its portfolios.

10.     Dynex Commercial was incorporated around 1992 and was formerly known as Multi-Family Capital Markets, Inc. and was also formerly known as Dynex Capital, Inc. (but not simultaneously with Dynex Capital using that name).   Dynex Commercial originated commercial mortgage loans, including multifamily (apartment) construction loans, multifamily permanent loans, and loans on other commercial real estate, and typically serviced those loans unless they were sold on the secondary market.  The individuals who served as the officers of Dynex Commercial, including Thomas Potts, Stephen Benedetti, Russell Parrish, Warren Wilkins, and Peter Van Graafeiland, were also officers of Dynex Capital and actually employed by Dynex Capital.

11.     In the 1990s, Dynex Commercial was a wholly-owned subsidiary of Dynex Holdings, Inc. ("Dynex Holdings"), which in turn was owned 99 percent by Dynex Capital and 1 percent by certain executive officers of Dynex Capital, including Thomas Potts and Stephen Benedetti.

12.     After Dynex Commercial made a number of multi-million-dollar real estate loans to ART and TCI (referred to collectively as "BCM Affiliates"), Dynex Commercial and BCM—on behalf of the BCM Affiliates—entered into a transaction that included two loan commitments: one to borrow $33.4 million to acquire and develop three buildings in New Orleans ("the New Orleans Loans"), and the other to borrow $160 million to finance other commercial and multifamily properties (the "$160 Million Commitment").

13.     The only loan Dynex Commercial ever funded under the $160 Million Commitment was made in April 1998 to a bankruptcy remote subsidiary of TCI to finance three apartment projects.  Several months later, with sixteen (16) months and $154 Million remaining on the Commitment, BCM attempted to borrow additional funds. Dynex Commercial refused to honor the terms of the commitment or to consider any proposals at the agreed rate or to fund tenant improvements under the New Orleans Loans unless the BCM Affiliates cancelled the remainder of the $160 Million Commitment.

14.     Plaintiffs sued Dynex Commercial on April 15, 1999 for breach of the $160 Million Commitment and for refusing to fund the tenant improvements under the New Orleans Loans and Dynex Capital for other related claims.  The case was initially filed in Dallas County Court at Law No. 5 and was transferred to the 68th Judicial District Court of Dallas County Texas in early 2003, where it was assigned Cause No. DC-03-00675 (the "State Court Action").

15.     After a six-week trial in January and February 2004, the jury unanimously found a breach of both the $160 Million Commitment and the New Orleans Loans and awarded substantial damages to Plaintiffs.  The jury rendered a verdict in the total amount of $28,059,187.25, plus $1,950,000.00 in attorney's fees, and an additional $100,000 in attorney's fees for an appeal to the court of appeals and $50,000 for an appeal to the Texas Supreme Court. However, the trial court granted Dynex Commercial's post-verdict motion for judgment notwithstanding the verdict and rendered judgment that Plaintiffs "take nothing."

16.     After a series of appeals to the Dallas Court of Appeals and the Texas Supreme Court, the case ultimately resulted in a final, non-appealable judgment (the "Final Judgment") in favor of the original Plaintiffs that was entered on July 20, 2015 by the Honorable Martin Hoffman, Presiding Judge of the 68th Judicial District Court, which awarded $448,899.59 plus post-judgment interest to BCM, $24,886,990.95 plus post-judgment interest to ART, and $19,554,065.57, plus post-judgment interest to TCI, plus an addition $1,600,000 plus post-judgment interest in attorney's fees and $170,563.76 plus post-judgment interest in costs to Plaintiffs.  With interest, the judgment totals over $55,000,000.00.

17.     After the judgment was entered, Plaintiffs began taking steps to collect the judgment from Dynex Commercial.

18.     On March 16, 2016, TCI served a Request for Production to Aid Enforcement of Judgment to Dynex Commercial ("Plaintiff's First Request") and a First Set of Interrogatories to Aid in the Enforcement of Judgment to Dynex Commercial ("Plaintiff's First Interrogatories").  In response, Dynex Commercial filed answers and objections which were served on May 2, 2016.  At this point, Plaintiffs learned that Dynex

Commercial had ceased operations and had no assets that could be used to pay any portion of the judgment, i.e., that Dynex Commercial had been rendered judgment-proof.

19.     On March 24, 2016, TCI served a Notice of Intent to Service Subpoena on Non-Party Dynex Capital ("Subpoena") requesting the production of documents.  Dynex Capital filed answers and objections to this Subpoena on May 6, 2016.

20.     The objections lodged by Dynex Commercial and Dynex Capital were not proper, but were designed to mislead the Court, obstruct the discovery process, delay the proceedings and effectively deny Plaintiffs any discovery.  Plaintiffs were forced to file motions to compel the discovery they requested.

21.     On February 27, 2017, Judge Hoffman of the 68th Judicial District Court entered an order compelling Dynex Capital to, among other things, produce documents relating to certain UCC filings and the real property, parties, and transactions referenced in those filings.

22.     On February 28, 2017, Judge Hoffman entered an order compelling Dynex Commercial to, among other things, produce documents relating to the UCC filings and the real property, parties, and transactions referenced in those filings.  Judge Hoffman further ordered Dynex Commercial to withdraw its objections and to supplement its answers to interrogatories.

23.     Plaintiffs were subsequently forced to seek an order holding Dynex Commercial and Dynex Capital in contempt for their refusal to comply with the 68th Court's Orders and intentionally and systematically destroying evidence relevant to Plaintiff's claims against them and the judgment itself.  Judge Hoffman made multiple rulings in which he granted sanctions against Dynex Capital and Dynex Commercial for

their discovery abuses, ordered further discovery, and reserved ruling on multiple motions for contempt.

24.     Through discovery and discovery motions in the State Court Action, Plaintiffs have learned that a significant amount of documents and information including missing tax returns, stock ownership documents for Dynex Commercial, documents relating to the unsatisfied judgment, the Dynex Entities' entire email system, documents regarding bank accounts, receivables, office furniture, computers, loan files, IRS tax memos and backup information, and other relevant materials went missing, are missing, or were destroyed.

25.     Plaintiffs have discovered that at the time they commenced the State Court Action in 1999, Dynex Commercial had a $600 million loan portfolio that it was servicing, had a net worth of $1 million to $2 million, and had gross revenues of $2 million to $3 million.   As the lawsuit progressed, Dynex Capital's executives, including Potts and Benedetti, decided to strip Dynex Commercial of assets so that it would be an asset-less shell by the time Plaintiffs obtained a judgment and so that Plaintiffs would be unable to collect their judgment.

26.     As part of this scheme, in the latter half of 2000 Dynex Commercial divested itself of all interests in commercial loans, including security interests, that it owned in connection with its $600 million loan portfolio, transferring many of those assets to Dynex Capital, including those listed below (the "Transfers").   The Transfers were directed by Potts and Benedetti and were carried out by Benedetti, Parrish, Wilkins, and Van Graafeiland, who executed the documents to accomplish the Transfers.

27.     On or before April 19, 1999, Dynex Commercial had originated a multi-million-dollar loan to Parkland Pointe Limited Partnership secured by an apartment

project located on 19.8 acres in Arlington, Texas, and further secured by personal property collateral associated with the apartment project as reflected in a UCC-1 filing on April 19, 1999, showing Dynex Commercial as the secured party.  On or about August 8, 2000, Dynex Commercial transferred its rights in the Parkland Pointe loan, including the security interest in the related personal property collateral, to Dynex Capital.  Dynex Commercial received no consideration from Dynex Capital for this transfer.

28.    On or before December 17, 1999, Dynex Commercial had originated a $3,281,100 loan to Allison Pointe Limited Partnership secured by an apartment project in Jefferson County, Colorado, and further secured by personal property collateral associated with the apartment project as reflected in a UCC-1 filing on December 17, 1999, showing Dynex Commercial as the secured party.  On or about August 18, 2000, Dynex Commercial transferred its rights in the Allison Pointe loan, including the security interest in the related personal property collateral, to Dynex Capital.  Dynex Commercial received no consideration from Dynex Capital for this transfer.

29.    On or before April 9, 1999, Dynex Commercial had originated a loan of over $1,000,000 to Arlington Investments MN-III Limited Partnership secured by an apartment project in the City of Rochester, Olmsted County, Minnesota, and further secured by personal property collateral associated with the apartment project as reflected in a UCC-1 filing on April 9, 1999, showing Dynex Commercial as the secured party.  On or about June 21, 2000, Dynex Commercial transferred its rights in the Arlington Investments MN-III loan, including the security interest in the related personal property collateral, to Dynex Capital.  Dynex Commercial received no consideration from Dynex Capital for this transfer.

30.     On or before November 30, 1999, Dynex Commercial had originated a loan of over $1,000,000 to Arlington Investments MN-IV Limited Partnership secured by an apartment project in the City of St. Cloud, Stearns County, Minnesota, and further secured by personal property collateral associated with the apartment project as reflected in a UCC-1 filing on November 30, 1999, showing Dynex Commercial as the secured party. On or about August 8, 2000, Dynex Commercial transferred its rights in the Arlington Investments MN-IV loan, including the security interest in the related personal property collateral, to Dynex Capital.  Dynex Commercial received no consideration from Dynex Capital for this transfer.

31.     On or before September 1, 1998, Dynex Commercial had originated a $6,864,200 loan to Buffalo Run Apartments Limited Partnership secured by an apartment project in Fort Collins, Larimer County, Colorado, and further secured by personal property collateral associated with the apartment project as reflected in a UCC-1 filing on September 1, 1998, showing Dynex Commercial as the secured party.  On or about August 22, 2000, Dynex Commercial transferred its rights in the Buffalo Run Apartments Limited Partnership loan, including the security interest in the related personal property collateral, to Dynex Capital.  Dynex Commercial received no consideration from Dynex Capital for this transfer.

32.     On or before February 1, 1999, Dynex Commercial had originated a loan of over $1,000,000 to Centrum-Greenbrier Limited Partnership secured by an apartment project in Virginia, and further secured by personal property collateral associated with the apartment project as reflected in a UCC-1 filing on February 1, 1999, showing Dynex Commercial as the secured party.  On or about August 8, 2000, Dynex Commercial transferred its rights in the Centrum-Greenbrier Limited Partnership loan, including the

security interest in the related personal property collateral, to Dynex Capital.   Dynex
Commercial received no consideration from Dynex Capital for this transfer.

33.     On or before April 28, 1999, Dynex Commercial had originated a multi-
million-dollar loan to Centrum-Kings Crest Limited Partnership secured by an apartment
project in Spotsylvania County, Virginia, and further secured by personal property
collateral associated with the apartment project as reflected in a UCC-1 filing on April 28,
1999, showing Dynex Commercial as the secured party.  On or about August 11, 2000,
Dynex Commercial transferred its rights in the Centrum-Kings Crest Limited Partnership
loan, including the security interest in the related personal property collateral, to Dynex
Capital.   Dynex Commercial received no consideration from Dynex Capital for this
transfer.

34.     On or before May 27, 1999, Dynex Commercial had originated a loan of over
$1,000,000 to Cottages of Hastings, Ltd. secured by an apartment project in Hastings,
Adams County, Nebraska, and further secured by personal property collateral associated
with the apartment project as reflected in a UCC-1 filing on May 27, 1999, showing Dynex
Commercial as the secured party.   On or about July 21, 2000, Dynex Commercial
transferred its rights in the Cottages of Hastings, Ltd. loan, including the security interest
in the related personal property collateral, to Dynex Capital.  Dynex Commercial received
no consideration from Dynex Capital for this transfer.

35.     On or before December 21, 1999, Dynex Commercial had originated a loan
of over $1,000,000 to Graham Housing Limited Partnership secured by an apartment
project in Graham, North Carolina, and further secured by personal property collateral
associated with the apartment project as reflected in a UCC-1 filing on December 21, 1999,
showing Dynex Commercial as the secured party.  On or about August 16, 2000, Dynex

Commercial transferred its rights in the Graham Housing Limited Partnership loan, including the security interest in the related personal property collateral, to Dynex Capital. Dynex Commercial received no consideration from Dynex Capital for this transfer.

36.   On or before January 1, 1999, Dynex Commercial had acquired from Mortgage Investment Group, Inc., rights in a loan of over $1,000,000 to Hutchinson Huski Limited Partnership secured by an apartment project in McLeod County, Minnesota, including the security interest in personal property collateral associated with the apartment project as reflected in a UCC-3 filing on January 4, 1999, reflecting an assignment to Dynex Commercial as the secured party. On or about July 21, 2000, Dynex Commercial transferred its rights in the Hutchinson Huski Limited Partnership loan, including the security interest in the related personal property collateral, to Dynex Capital. Dynex Commercial received no consideration from Dynex Capital for this transfer.

37.   On or before January 8, 1999, Dynex Commercial had originated a loan of over $1,000,000 to Northview Housing Associates, LP secured by an apartment project in McPherson, McPherson County, Kansas, and further secured by personal property collateral associated with the apartment project as reflected in a UCC-1 filing on January 8, 1999, showing Dynex Commercial as the secured party. On or about June 21, 2000, Dynex Commercial transferred its rights in the Hutchinson Northview Housing Associates, LP loan, including the security interest in the related personal property collateral, to Dynex Capital. Dynex Commercial received no consideration from Dynex Capital for this transfer.

38.     On or before May 5, 1999, Dynex Commercial had originated a $500,000 loan to Pinecrest/Tupelo, L.P. secured by an apartment project in Tupelo, Lee County, Mississippi, and further secured by personal property collateral associated with the apartment project as reflected in a UCC-1 filing on May 5, 1999, showing Dynex Commercial as the secured party.  On or about August 29, 2000, Dynex Commercial transferred its rights in the Pinecrest/Tupelo, L.P. loan, including the security interest in the related personal property collateral, to Dynex Capital.  Dynex Commercial received no consideration from Dynex Capital for this transfer.

39.     On or before August 17, 1999, Dynex Commercial had originated a $3,270,000 loan to Spring Hill, L.P., secured by an apartment project in Lebanon, Wilson County, Tennessee, and further secured by personal property collateral associated with the apartment project as reflected in a UCC-1 filing on August 17, 1999, showing Dynex Commercial as the secured party.  On or about June 20, 2000, Dynex Commercial transferred its rights in the Spring Hill, L.P. loan, including the security interest in the related personal property collateral, to Dynex Capital.  Dynex Commercial received no consideration from Dynex Capital for this transfer.

40.     Before 2000, Dynex Commercial had originated a loan of over $1,000,000 to Abbott Parkside, LLC secured by an apartment project in Michigan, and further secured by personal property collateral associated with the apartment project as reflected in a UCC-1 filing, showing Dynex Commercial as the secured party.  On or about June 21, 2000, Dynex Commercial transferred its rights in the Abbott Parkside, LLC loan, including the security interest in the related personal property collateral, to Dynex Capital.  Dynex Commercial received no consideration from Dynex Capital for this transfer.

41.     On or before June 2, 1999, Dynex Commercial had originated a multi-million-dollar loan to Affordable Housing Partners IV, Ltd., secured by an apartment project in Utah, and further secured by personal property collateral associated with the apartment project as reflected in a UCC-1 filing on June 2, 1999, showing Dynex Commercial as the secured party.  On or about July 19, 2000, Dynex Commercial transferred its rights in the Affordable Housing Partners IV, Ltd. loan, including the security interest in the related personal property collateral, to Dynex Capital.  Dynex Commercial received no consideration from Dynex Capital for this transfer.

42.     On or before April 12, 1999, Dynex Commercial had originated a loan of over $1,000,000 to Arlington Investments WI-I Limited Partnership secured by an apartment project in Wisconsin, and further secured by personal property collateral associated with the apartment project as reflected in a UCC-1 filing on April 12, 1999, showing Dynex Commercial as the secured party.  On or about November 21, 2000, Dynex Commercial transferred its rights in the Arlington Investments WI-I Limited Partnership loan, including the security interest in the related personal property collateral, to Dynex Capital.  Dynex Commercial received no consideration from Dynex Capital for this transfer.

43.     On or before May 7, 1999, Dynex Commercial had originated a $4,350,000 loan to Brisben Georgia I Limited Partnership secured by an apartment project in Atlanta, Georgia, and further secured by personal property collateral associated with the apartment project as reflected in a UCC-1 filing on May 7, 1999, showing Dynex Commercial as the secured party.  On or about September 12, 2000, Dynex Commercial transferred its rights in the Brisben Georgia I Limited Partnership loan, including the

security interest in the related personal property collateral, to Dynex Capital.  Dynex Commercial received no consideration from Dynex Capital for this transfer.

44.     In or about November 1997, Dynex Commercial had originated a $3,920,000 loan to Centrum Port Huron LDHA Limited Partnership secured by an apartment project in Ypsilanti, Michigan, and further secured by personal property collateral associated with the apartment project as reflected in a UCC-1 filing, showing Dynex Commercial as the secured party.  On or about September 21, 2000, Dynex Commercial transferred its rights in the Centrum Port Huron LDHA Limited Partnership loan, including the security interest in the related personal property collateral, to Dynex Capital.  Dynex Commercial received no consideration from Dynex Capital for this transfer.

45.     On or before June 7, 1999, Dynex Commercial had originated a $3,190,000 loan to Concord Pointe LP secured by an apartment project in Concord, North Carolina, and further secured by personal property collateral associated with the apartment project as reflected in a UCC-1 filing on June 7, 1999, showing Dynex Commercial as the secured party.  On or about June 20, 2000, Dynex Commercial transferred its rights in the Concord Pointe LP loan, including the security interest in the related personal property collateral, to Dynex Capital.  Dynex Commercial received no consideration from Dynex Capital for this transfer.

46.     On or before December 7, 1999, Dynex Commercial had originated a loan of over $1,000,000 to Hunters Glen Limited Partnership secured by an apartment project in Ohio, and further secured by personal property collateral associated with the apartment project as reflected in a UCC-1 filing on December 7, 1999, showing Dynex Commercial as the secured party.  On or about October 29, 2001, Dynex Commercial

transferred its rights in the Hunters Glen Limited Partnership loan, including the security interest in the related personal property collateral, to Dynex Capital.  Dynex Commercial received no consideration from Dynex Capital for this transfer.

47.     On or before May 12, 1999, Dynex Commercial had originated a $3,368,000 loan to Portland Housing, L.P. secured by an apartment project in Portland, Tennessee, and further secured by personal property collateral associated with the apartment project as reflected in a UCC-1 filing on May 12, 1999, showing Dynex Commercial as the secured party.  On or about August 22, 2000, Dynex Commercial transferred its rights in the Portland Housing, L.P. loan, including the security interest in the related personal property collateral, to Dynex Capital.  Dynex Commercial received no consideration from Dynex Capital for this transfer.

48.     On or before August 4, 1999, Dynex Commercial had originated a $5,283,800 loan to Stafford Pointe, LP secured by an apartment project in Virginia, and further secured by personal property collateral associated with the apartment project as reflected in a UCC-1 filing on August 4, 1999, showing Dynex Commercial as the secured party.  On or about June 20, 2000, Dynex Commercial transferred its rights in the Stafford Pointe, L.P. loan, including the security interest in the related personal property collateral, to Dynex Capital.  Dynex Commercial received no consideration from Dynex Capital for this transfer.

49.     On or before April 13, 1998, Dynex Commercial had originated a $30,000,000 loan to The Grand Reserve at Tampa Palms Limited Partnership secured by an apartment project in Tampa, Florida, and further secured by personal property collateral associated with the apartment project as reflected in a UCC-1 filing on April 13, 1998, showing Dynex Commercial as the secured party.  On or about June 23, 2000,

Dynex Commercial transferred its rights in the The Grand Reserve at Tampa Palms Limited Partnership loan, including the security interest in the related personal property collateral, to Dynex Capital.  Dynex Commercial received no consideration from Dynex Capital for this transfer.

50.     On or before February 19, 1999, Dynex Commercial had originated a $3,150,000 loan to The Rapids (Phase II) Apartments, L.P. secured by an apartment project in Columbia, South Carolina, and further secured by personal property collateral associated with the apartment project as reflected in a UCC-1 filing on February 19, 1999, showing Dynex Commercial as the secured party.  On or about September 8, 2000, Dynex Commercial transferred its rights in the The Rapids (Phase II) Apartments, L.P. loan, including the security interest in the related personal property collateral, to Dynex Capital.  Dynex Commercial received no consideration from Dynex Capital for this transfer.

51.     On or before September 3, 1999, Dynex Commercial had originated a $1,200,000 loan to Winnsboro Apartments, LP, secured by an apartment project in South Carolina, and further secured by personal property collateral associated with the apartment project as reflected in a UCC-1 filing on September 8, 1999, showing Dynex Commercial as the secured party.  On or about July 17, 2000, Dynex Commercial transferred its rights in the Winnsboro Apartments, LP loan, including the security interest in the related personal property collateral, to Dynex Capital.  Dynex Commercial received no consideration from Dynex Capital for this transfer.

52.     After all the loan assets were transferred out of Dynex Commercial, Dynex Commercial transferred its remaining fixed assets (computer equipment) to Dynex Holdings.  Dynex Commercial ceased operations at the end of 2000.  As of January 1,

2001, Dynex Commercial had no assets and no ability to satisfy a judgment.  Its $600 million loan portfolio had been reduced to zero, its net worth had been reduced to zero, and its multi-million-dollar annual revenue had been reduced to zero.

53.    Once Dynex Commercial had been divested of all assets, Dynex Holdings conveyed its 100 percent stock ownership of Dynex Commercial to Dynex Bank Holding Corp.  Dynex Holdings was then liquidated at the end of 2000.  Subsequently, 100 percent of the stock ownership of Dynex Commercial was transferred to ICD Holding, Inc., a corporation owned 100 percent by Benedetti.  Benedetti had been Vice-President of Dynex Commercial and subsequently became its President, although he has been an employee and officer of Dynex Capital since the early 1990s.   Currently, Benedetti is the sole officer of Dynex Commercial.  These changes in ownership were taken to attempt to distance Dynex Commercial from Dynex Capital.

54.    After the change in ownership, Dynex Commercial changed its name twice, first to NOA, Inc., and then to DCI Commercial, Inc., in an effort to further obfuscate matters and to delay and hinder Dynex Commercial's creditors—principally Plaintiffs.  In 2006, Benedetti filed papers with the Virginia Secretary of State to terminate Dynex Commercial's corporate existence, although it continues to exist for purposes of pending litigation.

55.    During the pendency of the State Court Action, Dynex Capital was funding the litigation costs, including paying Dynex Commercial's attorneys' fees.  Dynex Capital and Dynex Commercial entered into a Litigation Cost Sharing Agreement pursuant to which Dynex Capital agreed to pay the litigation expenses.  The Litigation Cost Sharing Agreement admits that Dynex Commercial "has limited financial resources and may be unable to fund certain costs associated with the litigation" and that Dynex Capital

acknowledges that Dynex Commercial's "active participation in the defense of the Litigation is critical to the ultimate successful outcome of such litigation." Accordingly, Dynex Capital agreed to advance on behalf of Dynex Commercial the costs of the litigation.

56.     Dynex Commercial was theoretically obligated to pay Dynex Capital back, which obligation was secured by a non-viable counterclaim Dynex Commercial had asserted in the State Court Action (and subsequently lost), but Dynex Commercial clearly lacked any ability to do so.  By the time of the trial in 2004, the payable advanced by Dynex Capital to Dynex Commercial had reached $4,034,196.92.  Currently, the amount theoretically owed by Dynex Commercial to Dynex Capital is over $10 million.

57.     In addition, under the Litigation Cost Sharing Agreement, Dynex Capital agreed to be responsible for twenty percent (20%) of any judgment entered in the State Court Action.

58.     Judge Hoffman in the State Court Action entered a Turnover Order on January 27, 2017, appointing Michael J. Quilling as the Receiver for the nonexempt property, including contract rights, of Dynex Commercial (the "Receiver").  The Receiver was empowered, among other things, to prosecute claims or causes of action the Receiver determined to be appropriate.

59.     By letter dated May 10, 2018 the Receiver made demand upon Dynex Capital for the immediate payment of $11,341,360.65, which amount represented 20% of the Judgment plus interest and costs, as contemplated by Section 1.2 of the Litigation Cost Sharing Agreement.  Dynex Capital received the demand letter on May 10, 2018 but has not paid as demanded.

## IV.  CAUSES OF ACTION

### Count One – Fraudulent Transfer (Tex. Bus. & Com. Code § 24.005(a)(1)) (Against Dynex Commercial and Dynex Capital)

60.     Plaintiffs incorporate and reallege the allegations set forth above.

61.     Dynex Commercial made the Transfers to Dynex Capital with the actual intent to hinder, delay, or defraud Plaintiffs, who had claims against Dynex Commercial before and within a reasonable time after the Transfers.  The Transfers were directed by Potts and Benedetti and carried out by Benedetti, Wilkins, Parrish, and Van Graafeiland with the intent to divest Dynex Commercial of all assets and discontinue its operations for the purpose of ensuring that Plaintiffs would be unable to collect any eventual judgment against Dynex Commercial.  The Transfers were accomplished on the dates set forth above in paragraphs 27 through 51, all after the State Court Action had been commenced and generally between June and December 2000.

62.     The Transfers were made to an insider because, at the time, Dynex Commercial was owned 100 percent by Dynex Holdings, which was owned 99 percent by Dynex Capital.

63.     Dynex Commercial and Dynex Capital concealed the Transfers from Plaintiffs as reflected by their abuses and obstruction of Plaintiffs' post-judgment discovery in the State Court Action, which required multiple motions to compel, motions for contempt, hearings, and orders from Judge Hoffman before Plaintiffs were able to obtain some information regarding the Transfers.

64.     Dynex Commercial and Dynex Capital also attempted to conceal the Transfers by changing the stock ownership of Dynex Commercial after the Transfers from Dynex Holdings to Dynex Bank Holding Corp. and from Dynex Bank Holding Corp. to

ICD Holdings, Benedetti's wholly-owned company.   In addition, Dynex Commercial changed its name twice after the Transfers, first to NOA, Inc., and then to DCI Commercial, Inc.

65.   Dynex Commercial had been sued by Plaintiffs the year before the Transfers were made, seeking damages of multiple millions of dollars for breach of the $160 Million Commitment and the New Orleans Loans.

66.   The Transfers, combined with other transfers, divested Dynex Commercial of substantially all of its assets.   In 1999, before the Transfers, Dynex Commercial had a $600 million loan portfolio, had ongoing loan origination and servicing operations, had a net worth of $1 million to $2 million, and had gross revenues of $2 million to $3 million. After the Transfers, and by the end of 2000, Dynex Commercial had no assets and no ability to satisfy a judgment.   Its $600 million loan portfolio had been reduced to zero, its net worth had been reduced to zero, its multi-million-dollar annual revenue had been reduced to zero, and it had ceased operations.

67.   Dynex Commercial received no value for the Transfers.   While discovery will be necessary to uncover additional facts regarding the assets transferred and their value, the assets that were the subject of the Transfers were valuable rights in loans that generally exceeded $1,000,000 and in many cases were multiple millions of dollars and included, at a minimum, security interests in the personal property associated with the apartment projects.

68.   The Transfers left Dynex Commercial insolvent.   By the end of 2000, Dynex Commercial had no operations, no revenue, and no assets.   But it did have debt and liabilities, including a very substantial liability to Plaintiffs in the State Court Action. Therefore, Dynex Commercial was balance sheet insolvent.   Also, in the Litigation Cost

Sharing Agreement, which is dated December 29, 2000 (immediately following the Transfers), Dynex Capital admits that Dynex Commercial is unable to fund the costs associated with the State Court Action, i.e., is unable to pay its debts as they come due which is one definition of insolvency.

69.     In accordance with § 24.008 of the Texas Uniform Fraudulent Transfer Act, and in order to remedy these fraudulent transfers, Plaintiffs seek the following remedies:

a.     to avoid the Transfers to the extent necessary to satisfy Plaintiffs' judgment against Dynex Commercial;

b.     an attachment or other provisional remedy against the assets transferred or other property of Defendants in accordance with the applicable Texas Rules of Civil Procedure and the Texas Civil Practice and Remedies Code relating to ancillary proceedings;

c.     an injunction against further disposition by Defendants of the property that was the subject of the Transfers, their proceeds, or other property of Defendants;

d.     appointment of a receiver to take charge of the property that was the subject of the Transfers;

e.     to levy execution on the assets transferred or their proceeds; and

f.     to recover judgment for the value of the assets transferred

70.     As a result of Defendants' fraudulent actions, Plaintiffs have suffered actual, consequential, incidental, and special damages, in excess of the minimum jurisdictional limits of this Court.

### *Count Two – Alter Ego (Against Dynex Capital)*

71.     Plaintiffs incorporate and reallege the allegations set forth above.

72.     Dynex Capital should be held jointly and severally liable for the judgment debt of Dynex Commercial owed to Plaintiffs because Dynex Capital and Dynex Commercial constituted a single business enterprise and carry out a common business objective.  Dynex Commercial and Dynex Capital have used similar names, indeed, at one time Dynex Commercial was known as Dynex Capital.  The officers of Dynex Commercial, including Potts, Benedetti, Wilkins, Parrish, and Van Graafeiland, were all employees and officers of Dynex Capital.  Dynex Capital and Dynex Commercial operated out of the same office space. Until after the Transfers were completed, Dynex Capital was the ultimate parent of Dynex Commercial—Dynex Capital owned 99 percent of Dynex Holdings, which owned 100 percent of Dynex Commerical—and Dynex Capital exercised absolute control over Dynex Commercial.  Dynex Commercial's financial reporting was done on a consolidated basis with Dynex Capital and its other subsidiaries.  Dynex Commercial functioned as Dynex Capital's commercial mortgage origination and servicing business.

73.     Dynex Capital used the corporate form of Dynex Commercial to perpetrate a fraud on Plaintiffs by inducing Plaintiffs to enter into the $160 Million Commitment and the New Orleans Loans on the pretext that Dynex Commercial was and would be capable of fulfilling its obligations under those agreements, and then stripping Dynex Commercial of all assets and discontinuing its operations after it had breached the agreements and been sued by Plaintiffs in order to deprive Plaintiffs of the ability to satisfy their judgment.

74.     Dynex Commercial was organized and operated as a mere tool or business conduit of Dynex Capital.  Dynex Capital used Dynex Commercial to originate and service commercial loans, including loans on apartment projects, but Dynex Capital treated those loans and loan rights as if they belonged to Dynex Capital instead of Dynex Commercial.

When it suited Dynex Capital, it simply transferred those loans and loan rights from Dynex Commercial to itself or to third parties.

75.     Dynex Capital also used the separate corporate form of Dynex Commercial to fraudulently conceal the Transfers by changing the stock ownership of Dynex Commercial after the Transfers from Dynex Holdings to Dynex Bank Holding Corp. and from Dynex Bank Holding Corp. to ICD Holdings, Benedetti's wholly-owned company. In addition, Dynex Commercial changed its name twice after the Transfers, first to NOA, Inc., and then to DCI Commercial, Inc.

76.     The Litigation Cost Sharing Agreement also shows Dynex Capital using Dynex Commercial as a device or sham to disguise wrongs or obscure fraud.  The Litigation Cost Sharing Agreement was entered on December 29, 2000, after Dynex Capital had rendered Dynex Commercial an asset-less shell company through its fraudulent transfers.  At that point, Dynex Commercial was judgment proof and unable to pay any eventual judgment in favor of Plaintiffs.  However, Dynex Capital continued to pay Dynex Commercial's legal fees to continue the trial court litigation for another four years through a six-week jury trial, and then for another eleven years through multiple appeals until the judgment was entered, and thereafter to obstruct Plaintiffs' post-judgment discovery.  The Litigation Cost Sharing Agreement fraudulently obligates Dynex Commercial to repay Dynex Capital for the advances of legal fees but at the time this agreement was entered Dynex Commercial had ceased operations and had no assets, rendering this commitment illusory.  The Agreement also fraudulently purported to secure Dynex Commercial's obligation with a meritless and unsuccessful counterclaim in the State Court Action.  Thus, Dynex Capital propped up Dynex Commercial as if it were

a viable entity in the State Court Action in order to protect itself and to prevent Plaintiffs from discovering that Dynex Commercial had become judgment-proof.

77.     Accordingly, Plaintiffs are entitled to pierce the corporate veil and hold Dynex Capital liable for the judgment debt of Dynex Commercial because Dynex Commercial was the "alter ego, alias, stooge, or dummy" of Dynex Capital and Dynex Commercial was "a device or sham used to disguise wrongs, obscure fraud, or conceal crime."

### *Count Three – Exemplary Damages*

78.     Plaintiffs incorporate and reallege the allegations set forth above.

79.     The acts complained of herein by Defendants were committed knowingly, willfully, intentionally, with actual awareness, or with actual malice.  In order to punish Defendants for such unconscionable overreaching and to deter such actions and/or omissions in the future, Plaintiffs seek recovery against Defendants for exemplary damages as provided by Chapter 41 of the Texas Civil Practice and Remedies Code. Plaintiffs request that exemplary damages be awarded against the Defendants of two times the amount of Plaintiffs' economic damages.

### *Count Four -- Attorneys' Fees*

80.     Plaintiffs incorporate and reallege the allegations set forth above.

81.     In accordance with § 24.013 of the Texas Uniform Fraudulent Transfer Act, Plaintiffs are entitled to recover their reasonable attorneys' fees incurred in prosecuting this action.

82.     Accordingly, Plaintiffs seek recovery of an additional sum to compensate them for the reasonable attorneys' fees incurred in prosecuting this suit, with further and subsequent awards of attorneys' fees in the event of appeals from this Court.

## V.  DEMAND FOR TRIAL BY JURY

83.     Plaintiffs demand trial by jury of all claims and issues so triable.

## VI.  PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED,** Plaintiffs respectfully request that Plaintiffs have and recover judgment against Defendants for actual, consequential, and incidental damages, with pre-judgment and post-judgment interest at the maximum rate allowed by law; an award in favor of Plaintiffs for their reasonable and necessary attorneys' fees and expenses; an award of taxable costs of court; and such other and further relief, both general and special, at law and in equity, to which Plaintiffs may be justly entitled.

Respectfully submitted, this 8th day of March 2019.

/s/ *J. Robert Arnett II*
J. Robert Arnett II
State Bar No. 01332900
barnett@carterarnett.com
**CARTER ARNETT PLLC**
8150 N. Central Expressway, Suite 500
Dallas, Texas 75206
(214) 550-8188 (Telephone)
(214) 550-8185 (Facsimile)

**ATTORNEYS FOR TCI**

and

Lawrence J. Friedman
State Bar No. 07469300
lfriedman@fflawoffice.com
Carter Boisvert
State Bar No.  24045519
cboisvert@fflawoffice.com
**FRIEDMAN & FEIGER, L.L.P.**
5301 Spring Valley Road, Suite 200
Dallas, Texas 75254

(972) 788-1400 (Telephone)
(972) 788-2667 (Facsimile)

**ATTORNEYS FOR TCI and BCM**

and

Michael L. Gaubert
State Bar No. 00785903
michael@gaubertlawgroup.com
**GAUBERT LAW GROUP, PC**
5001 Spring Valley Road, Suite 500W
Dallas, Texas 75244
(972) 743-4909 (Telephone)
(214) 204-0094 (Facsimile)

**ATTORNEY FOR TCI**

and

Clark B. Will
State Bar No. 21502500
cbw@kilgorelaw.com
The Law Office of Clark B. Will, P.C.
Of Counsel to:
KILGORE & KILGORE, PLLC
3109 Carlisle Street
Dallas, Texas 78204
(214) 379-0834 (Telephone)
(214) 379-0838 (Facsimile)

**ATTORNEYS FOR MICHAEL J. QUILLING, RECEIVER FOR ART**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 8, 2019, I electronically filed the foregoing document with the Clerk of Court for the U.S. District Court for the Northern District of Texas, Dallas Division, using the electronic case filing system of the Court.  The electronic case filing system will send a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept the Notice as service of this document by electronic means:

Michael L. Gaubert, Esq.
Gaubert Law Group, PC
5001 Spring Valley Road, Suite 500W
Dallas, Texas 75244
Telephone: (972) 743-4909
Facsimile: (214) 204-0094

Edward F. Fernandes, Esq.
Hunton & Williams, LLP
111 Congress Avenue, Suite 510
Austin, Texas 78701
Telephone: (512) 542-5000
Facsimile: (512) 542-5049

Clark B. Will, Esq.
The Law Office of Clark B. Will, PC
3109 Carlisle
Dallas, Texas 75204
Telephone: (214) 379-0834
Facsimile: (214) 379-0838

John C. Eichman, Esq.
Hunton & Williams, LLP
1445 Ross Avenue, Suite 3700
Dallas, Texas 75202
Telephone: (214) 979-3000
Facsimile: (214) 880-0011

Jeffrey M. Tillotson, Esq.
Tillotson Law
750 N. St. Paul Street, Suite 610
Dallas, Texas 75201
Telephone: (214) 382-3041
Facsimile: (214) 501-0731

*/s/ J. Robert Arnett II*
J. Robert Arnett II